[No. A040851. First Dist., Div. Two. Jan. 20, 1989.]

JAMES GREGORI et al., Plaintiffs and Respondents, v.
BANK OF AMERICA et al., Defendants and Appellants.

**COUNSEL**

Michael G. Watters, F. Elaine Malisch, Noreen M. Evans, O'Brien, Watters, Davis, Malisch & Piasta, Paul R. Haerle, Robert M. Blum, Steven F. Brockhage, Thelen, Marrin, Johnson & Bridges, George W. Coombe, Jr., Winslow Christian, Kristian D. Whitten, Michael F. O'Donnell and Geary, Shea, O'Donnell & Gratten for Defendants and Appellants.

A. Barry Cappello, Thomas G. Foley, Jr., Joseph M. Sholder, Michael L. Thornburg and Cappello & Foley for Plaintiffs and Respondents.

## OPINION

**KLINE, P. J.**—Appellants, defendants in complex civil litigation, moved to disqualify respondents' (plaintiffs') attorneys because one of them initiated an undisclosed social relationship with a legal secretary familiar with all aspects of the litigation employed by appellants' counsel. In the alternative, appellants sought to compel further discovery regarding the nature of the social relationship and matters the attorney and secretary may have discussed. The trial court denied both the motion to disqualify counsel and the request for further discovery.

### STATEMENT OF THE CASE

The litigation underlying this appeal is not relevant to the issue before us. Essentially, the suit is a "lender liability" action brought by members of the Sebastopol Cooperative Cannery (hereinafter the CO-OP), an association of apple growers. Numerous individual apple growers (hereinafter the Growers) sued both the Bank of America, N.T. and S.A. (hereinafter the Bank) and four directors and officers of the CO-OP (hereinafter referred to collectively as the Directors). The Bank acted as the CO-OP's lending institution. On December 13, 1985, the Growers filed a complaint, assertedly similar to that in *Kruse* v. *Bank of America* (1988) 202 Cal.App.3d 38 [248 Cal.Rptr. 217] (petn. for cert. filed Nov. 30, 1988), stating causes of action for fraud, breach of fiduciary duty, suppression of fact, breach of the covenant of good faith and fair dealing, constructive fraud, conspiracy, rescission and emotional distress. Appellants are the Bank and the Directors, the defendants below; respondents are the plaintiff Growers.

On June 4, 1987, the Bank moved to stay all proceedings pending discovery regarding disqualification of the Growers' attorney, Thomas G. Foley and his law firm, Cappello & Foley. The Bank alleged that Foley had established an improper social relationship with Jane Doe,[1] the secretary of a partner in O'Brien, Watters, Davis, Malisch & Piasta (hereinafter O'Brien), the law firm representing the Directors. The Bank further alleged that Foley used this relationship to obtain confidential information regarding the litigation. The trial court denied the motion.

On November 5, 1987, the Bank and the Directors moved to disqualify Cappello & Foley. In the alternative, said defendants requested that Jane Doe, who had refused to attend her noticed deposition, be compelled to

---

[1] The trial court ordered Jane Doe's true name to be kept confidential as a matter of courtesy.

attend and that Foley be required to respond to questions propounded at his deposition he had refused to answer. Defendants also applied for an order in re contempt in response to Jane Doe's refusal to submit to deposition. After a hearing held November 20, 1987, the court denied all relief sought by defendants. This appeal followed.

### STATEMENT OF FACTS

The principal players in the drama are: (1) Thomas G. Foley, Jr., a partner in Cappello & Foley, the law firm representing the plaintiff Growers; (2) O'Brien, the law firm representing the defendant Directors; (3) F. Elaine Malisch and Michael G. Watters, the O'Brien partners who were closely involved with the case and for whom Jane Doe worked; and (4) Jane Doe, a secretary at O'Brien.

The facts relevant to the motion to disqualify emerge from Jane Doe's declaration, the declarations of Malisch and Watters, and Foley's deposition, declaration and correspondence.

According to Malisch, Jane Doe was employed by the firm for about four years and gained her employers' trust and confidence. Due to the complex nature of the CO-OP litigation, the firm decided to put Jane Doe in charge of administering the case. In this capacity she received and reviewed all correspondence, typed pleadings and research memoranda, scheduled depositions, and attended most of the weekly staff meetings at which the case was discussed. Thus, as stated by the trial court, Jane Doe became "intimately familiar with virtually every aspect of the case."

Jane Doe provided little information directly to the court. In a declaration she stated that she and Foley met "after business hours on a purely social basis."[2] Some of their conversation centered on "personalities involved in the litigation." However, they never "discuss[ed] any matter having to do with any facet of the lawsuit itself. [¶] At no time was there any information of a confidential nature exchanged, including but not limited to defense strategies, client confidences, and confidential information received from the Bank of America or its attorneys."

Declarations of Jane Doe's employers provide different and more detailed information. Malisch declared that late in 1986 she learned that Jane Doe and Foley met after work for a drink. Malisch told Jane that the date was

---

[2] This declaration was obtained with the help of an attorney who represented certain of the plaintiffs in the underlying litigation who were not represented by Cappello & Foley; he acted as an intermediary for Foley, Malisch, and Watters in the Jane Doe matter and helped draft the declaration and obtain Jane Doe's signature. Foley said he may have participated in drafting the declaration, but could not remember.

inappropriate and, from her past experience with Jane, assumed Jane understood she should not see Foley socially again. At this time, Jane Doe reported that Foley claimed to have obtained divorce files on Malisch and another attorney working on the case. Watters also admonished Doe about socializing with Foley and expressed his concern that Foley was trying to improperly obtain information regarding the case.

Malisch declared that Jane Doe came to her office on the morning of April 28, 1987, after being uncharacteristically late for work, and reported that she had dined with Foley the prior evening and had too much to drink. She told Malisch that although the case had not been the main topic of conversation, "certain aspects of the case had been discussed including the lawyers involved, Foley's views on liability, including that the O'Brien law firm clients were 'evil' people who would shortly be put in jail. (Later Doe volunteered that Foley isn't really after our clients, so much as the Bank of America. . . .") Jane Doe disclosed to a friend that Foley told her an O'Brien client, one of the defendants, could face a jail term based on Foley's information about him.

The dinner date took place while Foley was in Santa Rosa to depose an O'Brien client, one of the Directors, whom Foley had described as being a key witness. Malisch reported her conversation with Jane Doe to Watters, and before the deposition of their client recommenced, the two talked to Doe about the dates with Foley. When told she should not have social contact with Foley, Jane Doe said her time after work was her own business, said she would date Foley behind her employers' backs, and left the room. Doe then telephoned Foley to warn him that Watters would arrive late at the deposition and was angry.

When Watters arrived at the deposition, he announced that he had just learned about the dinner date and felt he must disclose it to his clients; he asked Foley "to avoid the appearance of impropriety." When pressed, Foley said "I will make sure I have no social contact with any members of your firm for the pendency of this litigation." Watters later learned that Jane Doe spoke with Foley on the phone on May 1 and 5, after Foley promised to end social contact, and received flowers from him on her birthday, May 2. Foley confirmed this information. Malisch terminated Jane Doe's employment on May 4, 1987. Several months later, two women who had worked with Jane Doe at the O'Brien firm executed declarations stating that Jane Doe told them that "after the dinner date . . . [I] went to [Foley's] hotel room and had sexual intercourse with him."

Subsequently, Watters asked Foley to stipulate that he would have no further social contact with Jane Doe or any other members of the O'Brien

firm. Foley agreed he would maintain no such contacts, but "reserve[d] the right to discuss with [Jane Doe] any potential causes of action [she may have] for wrongful discharge, slander and infliction of emotional distress." He signed a stipulation along the lines suggested by Watters, and the court approved it on May 13, 1987.

Foley filed a declaration in which he denied discussing the case with Jane Doe, except with respect to the personalities of lawyers. During his lengthy deposition, Foley's attorney, his law partner A. Barry Cappello, frequently instructed him not to answer questions relating to the nature of his relationship with Jane Doe, often on privacy grounds. Resting on the work product privilege, Foley also refused to respond to questions relating to his interest in the personal lives of O'Brien attorneys; his possible interest in "insider information;" his knowledge about legal problems O'Brien clients might encounter; and any discussions he may have had about Jane Doe's rights against O'Brien. Foley frequently said he could not remember what he and Jane Doe had said to one another and could neither confirm nor deny that certain topics relating to the case were discussed.

Foley testified that he and Jane Doe met after work. Though he knew she was Watters's secretary, he did not know she had such an important role in the firm's management of the case. According to Foley, Jane Doe told him she had disclosed the date to Malisch, who had not objected. Four months later, during the deposition of an O'Brien client, Foley invited Jane Doe to dinner because, unlike others at the O'Brien firm, she had been "very gracious." He explained that the receipts for the drinks and dinner were marked "P.R." to reflect a draw on his income rather than a firm expense.

Foley denied attempting to obtain confidential information. Jane Doe provided him no documents from the O'Brien files, and disclosed nothing about the firm's tactics in the case. They did not talk about the case, the Bank, or the apple industry, nor did they discuss Jane Doe's job or O'Brien personnel practices, although after the firm fired her they may have briefly discussed the firm's personnel policies on the telephone. When questioned about the letter in which Foley "reserve[d] the right" to talk to Jane Doe about her legal recourse against O'Brien, Foley said he sent Jane Doe a copy of this letter without consulting her. He denied offering her a job or legal advice, but told her attorney that he would discuss paying her legal fees if the Bank engaged in a "witch hunt."

Foley admitted he and Jane Doe discussed various personalities involved with the case. He told her that he had obtained divorce files of Malisch and another attorney involved in the case, but did not discuss their personal lives with her. Foley also said his claim about the divorce files was false.

Foley did not remember discussing the Bank's liability, although they might have talked about who would win the case. Foley may well have told Jane Doe that O'Brien's clients should be suing the Bank, an opinion he voiced to everyone involved in the case. Jane Doe mentioned that an O'Brien client was having psychological problems as a result of the litigation, and this may have been related to a discussion of possible damages. There was some discussion of judges, but Foley only remembered one name that came up and they did not discuss peremptory challenges. Foley admitted he may have told Jane Doe that one of O'Brien's clients might be in serious trouble because of the case. They may have discussed the *Kruse* case. (*Kruse* v. *Bank of America, supra,* 202 Cal.App.3d 38.)

In his order denying the motion for disqualification or further discovery, the trial judge observed that "this case has tragically gone through a metamorphosis from a legal and factual dispute among the parties to a personal conflict among many of the attorneys involved. . . . This whole matter is an unattractive satire of the current state of our justice system where a 'win at all costs' philosophy obscures the legitimate purposes of litigation." Turning to the merits of the motion, the judge stated: "Clearly [Mr. Foley's acts] were the essence of unprofessionalism and poor judgment and should not have occurred. But the real issue is whether the acts have any substantial effect on the judicial proceedings to occur in the future. None of the moving papers have directed this court toward any substantive information that may have been made available. . . . In an action as complex and convoluted as this it is difficult to see how any side or party might gain any unfair advantage as a result of any transfer of information which may have occurred during the three contacts between Mr. Foley and Jane Doe."

The trial judge ruled that the misconduct did not warrant disqualification; but he publicly admonished Foley and, somewhat inexplicably, ordered him to obtain his clients' written consent to further representation.[3]

DISCUSSION

I.

■ The trial court's power "[t]o control in furtherance of justice, the conduct of its ministerial officers" is the basis upon which it may disqualify an attorney. (Code Civ. Proc., § 128, subd. (5); *Comden* v. *Superior Court* (1978) 20 Cal.3d 906, 916 [145 Cal.Rptr. 9, 576 P.2d 971, 5 A.L.R.4th 562],

---

[3] Rules 4-101 and 5-102 of the Rules of Professional Conduct (23 West's Ann. Civ. & Crim. Court Rules, pt. 2 (1981 ed.), pp. 558, 565), which provide that an attorney shall not accept employment adverse to a client or former client, or represent conflicting interests, without written consent, do not appear applicable to the facts of this case.

fn. 4, cert. den. 439 U.S. 981 [58 L.Ed.2d 652, 99 S.Ct. 568]; *People v. Superior Court (Greer)* (1977) 19 Cal.3d 255, 261, fn. 4 [137 Cal.Rptr. 476, 561 P.2d 1164].) An order denying a motion to disqualify the opposing party's attorney is appealable in this jurisdiction either as a denial of injunctive relief or as a collateral matter unrelated to the merits of the underlying litigation.[4] (*Meehan v. Hopps* (1955) 45 Cal.2d 213 [288 P.2d 267]; *Kraus v. Davis* (1970) 6 Cal.App.3d 484, 487 [85 Cal.Rptr. 846].) On appeal, the issue is whether the trial court abused its discretion. (*Comden v. Superior Court, supra,* 20 Cal.3d at p. 913; *People v. Superior Court, supra,* 19 Cal.3d at p. 269, *Chronometrics, Inc.* v. *Sysgen, Inc.* (1980) 110 Cal.App.3d 597, 608 [168 Cal.Rptr. 196]; *William H. Raley Co.* v. *Superior Court* (1983) 149 Cal.App.3d 1042, 1048 [197 Cal.Rptr. 232]; *Mills Land & Water Co.* v. *Golden West Refining Co.* (1986) 186 Cal.App.3d 116, 126 [230 Cal.Rptr. 461].) In exercising its discretion, the trial court must make a "reasoned judgment' and compl[y] with the '. . . legal principles and policies appropriate to the particular matter at issue.' " (*Bullis v. Security Pac. Nat. Bank* (1978) 21 Cal.3d 801, 815 [148 Cal.Rptr. 22, 582 P.2d 109, 7 A.L.R.4th 642], quoting *People v. Russel* (1968) 69 Cal.2d 187, 195 [70 Cal.Rptr. 210, 443 P.2d 794]; *Mills Land & Water Co.* v. *Golden West Refining Co., supra,* 186 Cal.App.3d at p. 126.) Conflicts in testimony or declarations must be resolved in favor of the prevailing party. (*Chronometrics, Inc.* v. *Sysgen, Inc., supra,* 110 Cal.App.3d at p. 603.)

Motions to disqualify counsel present competing policy considerations. On the one hand, a court must not hesitate to disqualify an attorney when it is satisfactorily established that he or she wrongfully acquired an unfair advantage that undermines the integrity of the judicial process and will have a continuing effect on the proceedings before the court. (*Comden v. Superior Court, supra,* 20 Cal.3d at p. 915; *Chronometrics, Inc.* v. *Sysgen, Inc., supra,* 110 Cal.App.3d at p. 607.) On the other hand, it must be kept in mind that disqualification usually imposes a substantial hardship on the disqualified attorney's innocent client, who must bear the monetary and other costs of finding a replacement. A client deprived of the attorney of his choice suffers a particularly heavy penalty where, as appears to be the case here, his attorney is highly skilled in the relevant area of the law.

Additionally, as courts are increasingly aware, motions to disqualify counsel often pose the very threat to the integrity of the judicial process that

---

[4]Such an order is not appealable in the federal courts (*Firestone Tire & Rubber Co.* v. *Risjord* (1981) 449 U.S. 368 [66 L.Ed.2d 571, 101 S.Ct. 669]), a determination that seems in part the result of a judicial perception "that the availability of an immediate appeal has seemingly contributed to the proliferation of disqualification motions and the use of such motions for purely tactical reasons, such as delaying the trial." (*Armstrong* v. *McAlpin* (2d Cir. 1980) 625 F.2d 433, 437 [51 A.L.R.Fed. 646] (in bank) vacated on other grounds and remanded, 449 U.S. 1106 [66 L.Ed.2d 835, 101 S.Ct. 911].)

they purport to prevent. (See *Armstrong* v. *McAlpin, supra,* 625 F.2d at pp. 437-438.) Such motions can be misused to harass opposing counsel (*Richardson-Merrell, Inc.* v. *Koller* (1985) 472 U.S. 424, 426, 436 [86 L.Ed.2d 340, 343-344, 350, 105 S.Ct. 2757]), to delay the litigation (*Comden* v. *Superior Court, supra,* 20 Cal.3d at p. 915), or to intimidate an adversary into accepting settlement on terms that would not otherwise be acceptable.[5] (Lindgren, *Toward a New Standard of Attorney Disqualification,* 2 American Bar Foundation Research Journal (1982) 419, 432; Note, *An Equitable Alternative to the Discriminatory Imposition of Vicarious Firm Disqualification* (1985) 31 Wayne L.Rev. 1031, 1047.) In short, it is widely understood by judges that "attorneys now commonly use disqualification motions for purely strategic purposes . . . ."[6] (*Woods* v. *Covington Cty. Bank* (5th Cir. 1976) 537 F.2d 804, 813; *International Electronics Corp.* v. *Flanzer* (2d Cir. 1975) 527 F.2d 1288, 1289; *Comden* v. *Superior Court, supra,* 20 Cal.3d 906, 915; Lindgren, *Toward a New Standard of Attorney Disqualification, supra,* at p. 440 and cases there cited.)

With the foregoing considerations in mind, we turn to the question whether the evidence before us warrants the disqualification of plaintiffs' counsel.

### II.

It is appropriate at the outset to emphasize the sui generis nature of this case: " '[i]t is a square peg which does not fit into the round holes of the rules most commonly applied in attorney disqualification cases.' " (*Mills Land & Water Co.* v. *Golden West Refining Co., supra,* 186 Cal.App.3d 116, 127, quoting *William H. Raley Co.* v. *Superior Court, supra,* 149 Cal.App.3d 1042, 1049-1050, fn. 3.) ■■■ Appellants concede that there

---

[5] An attorney who files a frivolous motion to disqualify or harass an opponent to delay the litigation can, of course, be sanctioned by being required to pay the attorneys fees and costs incurred by the other party. (Code Civ. Proc., § 128.5 see also, *North Am. Foreign Trading Corp.* v. *Zale Corp.* (S.D.N.Y. 1979) 83 F.R.D. 293.)

[6] The increase in the use of motions to disqualify counsel, a remedy rarely heard of until fairly recently, may also reflect the failure of the legal profession to use bar disciplinary proceedings to effectively enforce the canons of ethics (see *Kapelus* v. *State Bar* (1987) 44 Cal.3d 179, 203 [242 Cal.Rptr. 196, 745 P.2d 917] (conc. opn. of Kline, J.)) and the belief that only judicial intervention can insure compliance. (See Judd, *Conflicts of Interest—A Trial Judge's Notes* (1976) 44 Fordham L.Rev. 1097 ["Because [bar disciplinary] efforts are inadequate, it follows that the courts cannot hold themselves wholly aloof from the conflicts of interest problem . . . ."].) The entry of the courts into the field of lawyer ethics through the medium of motions to disqualify is not necessarily a salutary development. Apart from the problems just mentioned, the highly subjective nature of many alleged improprieties, the unfamiliarity of some judges with the exigencies confronting practitioners, and the absence of prior administrative review impair uniform and predictable judicial decisionmaking in this area. (See, Note, *Disqualification of Attorneys and Their Firms for Conflicts of Interest: A Lack of Consistency in Both Federal and State Courts* (1987) 26 Washburn L.J. 493.)

is no provision of the Rules of Professional Conduct (hereinafter rule) or statute that *explicitly* proscribes Foley's conduct,[7] but claim that the acts in question are impliedly prohibited by certain rules and statutes, or that at the very least said acts create an "appearance of impropriety." Consequently, they argue, the trial court was legally obliged to presume Foley succeeded in improperly obtaining confidential information from Jane Doe. Either because the presumption is nonrebuttable, or because Foley failed to rebut it, appellants claim the motion to disqualify should have been granted.

## A.

As will be seen, the rules and statutes upon which appellants rely cannot be applied to the facts of this case without procrustean effort.

Appellants argue that pursuant to rule 4-101 (23 West's Ann. Civ. & Crim. Ct. Rules, pt. 2, *supra,* at p. 558), an attorney may not represent adverse interests, or a new client with interests adverse to those of a former client on a matter substantially related to the former representation.[8] The contention appears to be that Foley and his law firm must be disqualified because Jane Doe was in effect induced to switch sides. In making this argument appellants rely primarily on two cases in which nonlawyers—an office manager and a legal secretary, respectively—left the employ of one side's counsel and joined the staff of opposing counsel. (*Kapco Mfg. Co., Inc.* v. *C & O Enterprises, Inc.* (N.D.Ill. 1985) 637 F.Supp. 1231; *Lackow* v. *Walter E. Heller & Co. Southeast* (Fla.Dist.Ct.App. 1985) 466 So.2d 1120, see also, *Williams* v. *Trans World Airlines, Inc.* (W.D.Mo. 1984) 588 F.Supp. 1037; *Swanson* v. *Wabash, Inc.* (N.D.Ill. 1984) 585 F.Supp. 1094.) The difficulty with the argument is that Jane Doe never left her employment at any material time, and was never employed by Foley's firm or any client of that firm. Nor can we deem her social relationship with Foley to constructively constitute side-switching in the absence of evidence that she actually disclosed confidential information or stronger evidence of the likelihood that she did so. (See *Kapco Mfg. Co., Inc.* v. *C. & O. Enterprises, Inc., supra,* 637 F.Supp. at pp. 1237-1240.)

Appellants' reliance on rule 7-103 (23 West's Ann. Civ. & Crim. Ct. Rules, pt. 2, *supra,* at p. 575), which prohibits an attorney from having an

[7] Business and Professions Code section 6076 provides that "With the approval of the Supreme Court, the Board of Governors [of the State Bar] may formulate and enforce rules of professional conduct for all members of the bar in the State." Thirty such rules approved by the Supreme Court are currently in effect; they are set forth in volume 23 of West's Annotated Civil and Criminal Court Rules, part 2 (1981 ed.) at pages 530-589.

[8] Rule 4-101 provides that "A member of the State Bar shall not accept employment adverse to a client or former client, without the informed and written consent of the client or former client, relating to a matter in reference to which he has obtained confidential information by reason of or in the course of his employment by such client or former client."

ex parte communication with an adverse party without the consent of the party's attorney, is similarly problematical.[9] Though she was privy to confidential information, Jane Doe is neither a party nor the direct employee of a party. Construing rule 7-103 so as to bar an attorney from communicating with employees of a law firm representing an opposing party would create far more problems than it would solve. We decline to do so.

Our discussion of rules 4-101 and 7-103 should not suggest that disqualification is *necessarily* warranted where an attorney violates a specific disciplinary rule. As has been pointed out, disciplinary rules promulgated by bar associations are not intended to be used as procedural weapons in disqualification cases. (Lindgren, *Toward a New Standard of Attorney Disqualification, supra,* Am. Bar Found. Research J. 421, 426; Sutton, *How Vulnerable is the Code of Professional Responsibility?* (1979) 57 N.C.L. Rev. 497, 514-515; see also *Comden* v. *Superior Court, supra,* 20 Cal.3d at p. 919 [dis. opn. of Manuel, J.].) Indeed, the ABA Model Rules specifically provide that "[t]he fact that a Rule is a just basis for a lawyer's self-assessment, or for sanctioning a lawyer under the administration of a disciplinary authority, does not imply that an antagonist in a collateral proceeding or transaction has standing to seek enforcement of the rule." (ABA Model Rules of Professional Conduct, Scope; see also Cal. Rules of Prof. Conduct, rule 1-100, approved by the Cal. Supreme Court on Nov. 28, 1988, eff. May 27, 1989 ["Nothing in these rules shall be deemed to create [or] augment . . . any substantive legal duty of lawyers or the non-disciplinary consequences of violating such a duty"].).)

Appellants' contention that Foley violated not just the Rules of Professional Conduct, but also the work product privilege codified in section 2018 of the Code of Civil Procedure cannot be reconciled with the findings of the trial court and has no support in the limited record before us. The court's order states that Foley did not obtain "substantive information" from Jane Doe, and goes on to note that any "[i]nformation concerning the attitudes, abilities, nuances and personalities of the attorneys and staff, the court, and other participants were and are all available from other sources." Appellants insist that section 2018 applies to the "attitudes of attorneys and staff" because subdivision (c) of that statute prohibits discovery of "an attorney's impressions, conclusions, opinions . . . or theories." This argument is beside the point. The trial court did not indicate that Code of Civil Procedure section 2018 was inapplicable to the "attitudes" of opposing counsel, but

---

[9] Rule 7-103 provides that: "A member of the State Bar shall not communicate directly or indirectly with a party whom he knows to be represented by counsel upon a subject of controversy, without the express consent of such counsel. This rule shall not apply to communications with a public officer, board, committee or body."

simply that any such information that might have been obtained was not substantive and, in any event, was readily obtainable elsewhere.

Appellants dispute the trial court's finding that substantive information was not divulged by claiming that the mere fact of the communications between Foley and Jane Doe required the court to *presume* that confidential information passed hands. The cases that employ a nonrebuttable presumption that counsel obtained confidential information are for the most part those in which an attorney is claimed to have violated conflict of interest rules protecting the confidentiality of client information and the party seeking disqualification cannot prove the disclosure without giving up the protection the rule was designed to provide. (See, e.g., *Global Van Lines, Inc.* v. *Superior Court* (1983) 144 Cal.App.3d 483 [192 Cal.Rptr. 609].) However, a presumption does not come into play under this case law unless the party seeking disqualification shows not only an apparent conflict of interest or impropriety but the likelihood that, as a result of the conflict or impropriety, the attorney acquired confidential information useful to his client. Thus, in conflict of interest situations governed by rule 4-101, *supra,* the attorney's knowledge of confidential information is presumed only "[w]hen a substantial relationship has been shown to exist between the former representation and the current representation, and when it appears by virtue of the nature of the former representation or the relationship of the attorney to his former client confidential information material to the current dispute would normally have been imparted to the attorney or to subordinates for whose legal work he was responsible . . . ." (*Global Van Lines, Inc.* v. *Superior Court, supra,* 144 Cal.App.3d 483, 489; *Elliott* v. *McFarland Unified School Dist.* (1985) 165 Cal.App.3d 562, 568-569 [211 Cal.Rptr. 802]; *River West, Inc.* v. *Nickel* (1987) 188 Cal.App.3d 1297, 1302-1304 [234 Cal.Rptr. 33]; see also, *People* ex rel. *Deukmejian* v. *Brown* (1981) 29 Cal.3d 150, 156 [172 Cal.Rptr. 478, 624 P.2d 1206]; *Yorn* v. *Superior Court* (1979) 90 Cal.App.3d 669, 675 [153 Cal.Rptr. 295].)[10] As has been stated, "If there is *a reasonable probability* that confidences were disclosed which could be used against the client in later, adverse representation, a substantial relationship between the two cases is presumed." (*Trone* v. *Smith* (9th Cir. 1980) 621 F.2d 994, 998, italics added, fn. omitted; see

---

[10] The seminal federal case articulating this rule is *T. C. Theatre Corp.* v. *Warner Bros. Pictures* (S.D.N.Y. 1953) 113 F.Supp. 265, 268-269, in which Judge Weinfeld stated that "the former client need show no more than that the matters embraced within the pending suit wherein his former attorney appears on behalf of his adversary are substantially related to the matters or cause of action wherein the attorney previously represented him, the former client. The Court will assume that during the course of the former representation confidences were disclosed to the attorney bearing on the subject matter of the representation. It will not inquire into their nature and extent. Only in this manner can the lawyer's duty of absolute fidelity be enforced and the spirit of the rule relating to privileged communications be maintained."

also, *State of Ark.* v. *Dean Foods Products Co., Inc.* (8th Cir. 1979) 605 F.2d 380, 384, overruled on other grounds by *In re Multi-Piece Rim Products Liability* (8th Cir. 1980) 612 F.2d 377, 378 [" 'attorney-client relationship raises an irrefutable presumption that confidences were disclosed.' "].)

█ The relationship between Jane Doe and Foley established by the scant evidence in the record does not create a reasonable probability that important information regarding the lawsuit was divulged. Thus, unlike the conflict of interest cases upon which appellants rely, which might otherwise be persuasive, the record in this case does not provide the necessary evidentiary basis for the legal presumption that Foley acquired confidential information useful to his clients.

### B.

Appellants are left with the argument, which is indeed at the center of their entire case, that Foley should be disqualified because, at the very least, his behavior creates an appearance of impropriety that cannot be countenanced without undermining the integrity of the judicial system. Canon 9 of the American Bar Association Model Code of Professional Responsibility (hereinafter Canon 9) provides that: "A lawyer should avoid even the appearance of professional impropriety."[11] California has not adopted Canon 9, either in the Rules of Professional Conduct of the State Bar of California or in the Business and Professions Code. Indeed, reference to the ABA Code was in 1975 deleted from the California Rules of Professional Conduct. █ Nevertheless, the ABA Code still "serves to guide California courts" (*Chambers* v. *Superior Court* (1981) 121 Cal.App.3d 893, 898, fn. 3 [175 Cal.Rptr. 575]; see also *Paul E. Iacono Structural Engineer, Inc.* v. *Humphrey* (9th Cir. 1983) 722 F.2d 435, 439-440, fn. 6), cert. den. 464 U.S. 851 [78 L.Ed.2d 148, 104 S.Ct. 162] *sub nom. Construction and General Laborers Union* v. *Paul E. Iacono Structural Engineer, Inc.,* which have adverted to Canon 9 or the appearance of impropriety standard in a variety of contexts. (See, e.g., *Comden* v. *Superior Court, supra,* 20 Cal.3d 906, 912; *People* v. *Rhodes* (1974) 12 Cal.3d 180, 185 [115 Cal.Rptr. 235, 524 P.2d 363]; *Woods* v. *Superior Court* (1983) 149 Cal.App.3d 931, 936 [197 Cal.Rptr. 185]; *Chadwick* v. *Superior Court* (1980) 106 Cal.App.3d 108, 115, fn. 7, 120 [164 Cal.Rptr. 864]; *Bruno* v. *Bell* (1979) 91 Cal.App.3d 776, 788 [154 Cal.Rptr. 435].)

---

[11]The ABA Model Code of Professional Responsibility has three components: the nine canons that articulate the broad principles which form the basis of an attorney's ethical responsibilities; the ethical considerations which declare the objectives to which all lawyers should aspire; and the disciplinary rules, which set forth mandatory minimum levels of professional conduct all lawyers are required to maintain. (See Model Code of Prof. Responsibility, Preliminary Statement.)

▮ Despite the many references to the appearances standard in our case law, and despite occasional judicial statements that "[d]isqualification is proper . . . to avoid any appearance of impropriety" (*Woods* v. *Superior Court, supra,* 149 Cal.App.3d 931, 936), there is no California case in which an attorney has been disqualified *solely* on this basis.[12] Invariably, Canon 9 has been relied upon to disqualify counsel only where the appearance of impropriety arises in connection with a tangible dereliction. For example, in *Woods* v. *Superior Court, supra,* 149 Cal.App.3d 931, a marital dissolution case, the court disqualified from representing the husband an attorney who represented and continued to represent a corporation owned by the husband and wife. Though the opinion emphasizes the importance of avoiding any appearance of impropriety, the disqualification was primarily based upon counsel's violation of rule 4-101 (23 West's Ann. Civ. & Crim. Ct. Rules, pt. 2, *supra,* p. 558), the rule that prohibits a lawyer from accepting employment adverse to a client or former client without written consent.

Similarly, in *Comden* v. *Superior Court, supra,* 20 Cal.3d 906, the Supreme Court approved the disqualification of a law firm on the ground that one of its members might be called as a witness. Although the court speaks about the need to avoid the appearance of impropriety so that doubt will not " 'becloud the public's view of the ethics of the legal profession and thus impugn the integrity of the judicial process' " (*id.,* at p. 912, quoting *U. S. ex rel. Sheldon El. Co.* v. *Blackhawk Htg. & Plmg.* (S.D.N.Y. 1976) 423 F.Supp. 486, 489), the court had a more fundamental reason for disqualifying the attorney: rule 2-111(A)(4) (23 West's Ann. Civ. & Crim. Ct. Rules, pt. 2, *supra,* pp. 547-548), which requires a lawyer, and in some circumstances his firm, to withdraw from employment if he "knows or should know that [a lawyer in his firm] ought to be called as a witness on behalf of [his] client in litigation concerning the subject matter of such employment." The court linked its discussion of the attorney's unseemly conduct and

---

[12] But see *People* v. *Jackson* (1985) 167 Cal.App.3d 829 [213 Cal.Rptr. 521], in which a criminal conviction was reversed because of an undisclosed "dating" relationship of about eight months between the public defender and prosecutor. The court relied heavily on the public defender's failure to advise his client of the relationship. "Since the situation created by counsel's lack of disclosure defies its quantification, actual prejudice need not be shown by defendant as a condition of relief. A potential if not an actual conflict has been demonstrated and thus the appearance, at least, of impropriety. In these circumstances, we are foreclosed from ' " 'indulg[ing] in nice calculations as to the amount of [resulting] prejudice.' " ' [Citation.]" (*Id.,* at p. 833.)

*Jackson,* however, was not a disqualification case, but involved an ineffective assistance of counsel claim in which Sixth Amendment rights were implicated by the apparent conflict of interest. The court expressed no opinion about whether the dating relationship violated rule 5-102(A), which requires an attorney to disclose his "relation, if any, with the adverse party." (*Id.,* at p. 833, fn. 1.) As previously noted, Jane Doe was neither an adverse party nor employee of an adverse party (*supra,* at p. 303), so rule 5-102(A) is even less applicable to the instant case.

public's perception of the legal system to the specific prohibition enunciated in rule 2-111 by pointing out that the rule "seeks to avoid the *appearance* of attorney impropriety." (*Ibid.,* italics in original.)

Most courts seem, at least implicitly, to recognize that, as one commentator has put it, the appearance of impropriety test is no more than "a simple and soulful rubric that seems to make intuitive sense" but whose alluring charms "are only surface." (Wolfram, *Modern Legal Ethics* (1986) § 7.1.4, at p. 319.) The standard is too imprecise to furnish a reliable judicial guideline. For one thing, it is unclear as *to whom* the conduct in question must appear improper. Some courts think it is "the public" or an "average layman." (See, e.g., *State of Ark.* v. *Dean Foods Products Co., Inc., supra,* 605 F.2d 380, 385; *In re Eastern Sugar Antitrust Litigation* (3d Cir. 1982) 697 F.2d 524, 530; see also, *Liljeberg* v. *Health Services Acquisition Corp.* (1988) 486 U.S. 847, 862-863 [100 L.Ed.2d 855, 873-874, 108 S.Ct. 2194, 2203].) Others inquire only into the view of "reasonable persons." (*In re Coordinated Pretrial Proceedings, Etc.* (9th Cir. 1981) 658 F.2d 1355, 1361, cert. den. 455 U.S. 990 [71 L.Ed.2d 850, 102 S.Ct. 1615], and cases therein cited.) Still other courts believe the opinion of "the bar" is a relevant consideration. (*Fred Weber, Inc.* v. *Shell Oil Co.* (8th Cir. 1977) 566 F.2d 602, 609, cert. den. 436 U.S. 905 [56 L.Ed.2d 403, 98 S.Ct. 2235], overruled on other grounds by *In re Multi-Piece Rim Products Liability, supra,* 612 F.2d 377, 378.) And in a few cases the perceived response of a client or client group is thought deserving of weight. (See, e.g., *Cardinale* v. *Golinello* (1977) 43 N.Y.2d 288 [401 N.Y.S.2d 191, 372 N.E.2d 26, 30].)

Even if there were no conflict as to whom the conduct of an attorney must appear improper, judges lack the empirical data necessary to accurately discern the views of the appropriate group. "As a general goal, gaining the confidence of the public and of clients in the legal profession, in the judicial system, and even in the conflict of interest rules is greatly to be encouraged. But courts lack both access to reliable facts and a workable method for thinking through, on a case by case basis, the question whether the particular result sought by one or the other of the parties will increase, decrease, or leave unaffected the general level of public or client confidence." (Wolfram, *Modern Legal Ethics, supra,* § 7.1.4., p. 322.)

For the foregoing reasons, use of the appearances standard for disqualification purposes without more has been criticized by many of the commentators.[13] (See, e.g., Kramer, *The Appearance of Impropriety Under*

---

[13] The appearances standard has also been criticized on the doctrinal ground that many members of the public do not understand the responsibilities of counsel, particularly in criminal cases, and that lawyers should not have to be concerned with avoiding unfounded criticism. (See, e.g., Sutton, *How Vulnerable is the Code of Professional Responsibility?, supra,* 57

*Canon 9: A Study of the Federal Judicial Process Applied to Lawyers* (1980) 65 Minn. L. Rev. 243, 264-265; O'Toole, *Canon 9 of the Code of Professional Responsibility: An Elusive Ethical Guideline* (1979) 62 Marquette L. Rev. 313; Note, *Appearance of Impropriety as the Sole Ground for Disqualification* (1977) 31 U. Miami L. Rev. 1516; Note, *Disqualification of Counsel for the Appearance of Professional Impropriety* (1976) 25 Cath. U.L. Rev. 343.) Although some federal courts have ordered disqualification solely on the basis of the appearance of impropriety (see, e.g., *In re Eastern Sugar Antitrust Litigation, supra,* 697 F.2d 524; *In re Coordinated Pretrial Proceedings, Etc., supra,* 658 F.2d 1355; *Renshaw* v. *Ravert* (E.D.Pa. 1978) 460 F.Supp. 1089), the better reasoned federal cases recognize that "while Canon 9 does imply that there need be no proof of actual wrongdoing . . . there must be at least a reasonable possibility that some specifically identifiable impropriety did in fact occur." (*Woods* v. *Covington Cty. Bank, supra,* 537 F.2d 804, 813, fn. omitted.) Stated differently, "when there is no claim that the trial will be tainted, appearance of impropriety is simply too slender a reed upon which to rest a disqualification order except in the rarest of cases." (*Bd. of Ed. of N.Y. City* v. *Nyquist* (2d Cir. 1979) 590 F.2d 1241, 1247.) ■ "The possibility that an attorney's representation in a given case may give rise to an 'appearance of impropriety' is not enough to disqualify. Specific facts must point to a marked danger that the perceived evil . . . will result." (*Society for Good Will to Retarded, etc.* v. *Carey* (E.D.N.Y. 1979) 466 F.Supp. 722, 724.)[14]

■ The case law and the legal literature persuade us that it is relatively unimportant whether the status or misconduct claimed to warrant disqualification is proscribed by a particular ethical norm or disciplinary rule or may be characterized as a failure to avoid the appearance of impropriety. Since the purpose of a disqualification order must be prophylactic,

N.C.L. Rev. at p. 512; Wolfram, *Modern Legal Ethics, supra,* at pp. 320-321.) Indeed, as Professor Wolfram points out, the ABA Model Code of Professional Responsibility itself "warns against pusillanimous cowering before unreasonable public opinion." (*Id.,* at p. 321.) Ethical Consideration 9-2 of the ABA Code, which relates to Canon 9, states in part as follows: "While a lawyer should guard against otherwise proper conduct that has a tendency to diminish public confidence in the legal system or in the legal profession, his duty to clients or to the public should never be subordinate merely because the full discharge of his obligation may be misunderstood or may tend to subject him or the legal profession to criticism."

[14] We are aware that, unlike the California Rules of Professional Conduct that apply to attorneys, the California Code of Judicial Conduct, which applies to judges, does adopt the appearances standard. Canon 2 of the Code provides that "A Judge Should Avoid Impropriety and the Appearance of Impropriety in All His Activities." Because public confidence in the integrity of the judicial process depends much more heavily on the conduct and impartiality of judges than that of lawyers, and because judges are public officers who do not have clients whose special interests must be taken into account, nothing in our opinion should be construed to bear upon application of the appearances standard to judges. (See *Liljeberg* v. *Health Services Acquisition Corp., supra,* 486 U.S. 847 [100 L.Ed.2d 855, 108 S.Ct. 2194].)

not punitive, the significant question is whether there exists a genuine likelihood that the status or misconduct of the attorney in question will affect the outcome of the proceedings before the court. ▮▮▮ Thus, disqualification is proper where, as a result of a prior representation or through improper means, there is a reasonable probability counsel has obtained information the court believes would likely be used advantageously against an adverse party during the course of the litigation. Though such information cannot be unlearned, and the lawyer who obtained it cannot be prevented from giving it to others, disqualification still serves the useful purpose of eliminating from the case the attorney who could most effectively exploit the unfair advantage. (*Chronometrics, Inc.* v. *Sysgen, Inc., supra,* 110 Cal.App.3d 597, 607-608.) Disqualification is inappropriate, however, simply to punish a dereliction that will likely have no substantial continuing effect on future judicial proceedings. (*Id.,* at p. 607.) There are other sanctions which in that situation must suffice, including imposition of attorneys fees and costs incurred by the other side as a result of the misconduct (Code Civ. Proc., § 128) and reporting of the misconduct to the State Bar of California so that it may determine whether disciplinary action is appropriate, in which case the attorney should be notified that this has been done. (Cf. Bus. & Prof. Code, § 6086.7.)

## C.

▮▮▮ The evidence before us does not warrant disqualification. There is no doubt that, as found by the trial court, Foley's acts "were the essence of unprofessionalism and poor judgment." However, it is one thing to say Foley's conduct was unprofessional and showed bad judgment and quite another to say, as the trial court did not, that it warrants his disqualification. Resolving conflicts in the testimony and declarations in favor of the prevailing parties, as we must, the record shows only that Foley initiated a social relationship with Jane Doe that consisted of two or three meetings after work. With respect to the substance of their conversations, the record satisfactorily establishes only that in a very general way the two discussed "personalities involved in the litigation." As Shakespeare observed, it is not uncommon for legal adversaries to "strive mightily, but eat and drink as friends." (Shakespeare, The Taming of the Shrew, act I, scene ii.) The impropriety that now appears in this case consists not so much of the fact that Foley initiated and maintained a social relationship with Jane Doe, but that he did so secretly, thereby casting doubt upon his motives. The evidence that the relationship was actually of a more intimate or intense nature than that frequently seen among representatives of competing parties, making it more likely confidential information was disclosed, is based entirely on hearsay declarations. The evidence, taken as a whole, simply does not establish a probability Foley obtained information that could be used ad-

vantageously against appellants. Accordingly, on the record before us, we cannot say that denial of the motion to disqualify represents an abuse of discretion.

## III.

Alternative to their argument that Foley and his law firm should be disqualified as a matter of law, the Bank and Directors maintain that the trial court abused its discretion by refusing to allow them further discovery while at the same time ruling that they failed to provide sufficient evidence to warrant disqualification. More specifically, appellants contend that the court should have ordered Jane Doe to attend her deposition and compelled Foley to answer questions he unjustifiably refused to answer at his deposition.

Ordinarily, a trial court's order denying discovery may not be reviewed until after final judgment. (*Pacific Tel. & Tel. Co.* v. *Superior Court* (1970) 2 Cal.3d 161, 169 [84 Cal.Rptr. 718, 465 P.2d 854].) However, the discovery with which we are here concerned does not relate to the merits of the underlying case. Considering the substance of the Bank's claim, and the appealability in this jurisdiction of an order denying a motion to disqualify, we cannot defer resolution of the discovery issue until final judgment is rendered.

As earlier indicated, Jane Doe filed a short declaration in which she acknowledged her social relationship with Foley but denied providing him "any information of a confidential nature." In June 1987 the Bank filed a subpoena duces tecum ordering Jane Doe to appear at a deposition to be held on July 7, 1987. On July 20, after Jane Doe failed to appear, the Bank applied for an order to show cause why she should not be held in contempt. The hearing on this matter was held on August 5. Although Jane Doe was present and represented by counsel, she neither presented evidence nor opposed the application. The court took the question under submission and deliberately delayed its ruling until November 20, 1987.[15] In an order dated November 25, the court denied the application, thereby refusing to order Jane Doe to submit to deposition, for the following reasons: "As a result of these activities Jane Doe has already lost her job, has substantially damaged

---

[15] The trial judge delayed his decision beyond the constitutionally required 90-day period, and thereby delayed his own pay (Cal. Const., art. VI, § 19), for the following reason: "As you're all aware, I have not ruled on [the application for the order to show cause]. That's been done by me intentionally. It's been done by me in a situation that has required me to delay filing of pay vouchers and not receive pay on a timely basis because I did not want another individual destroyed in this proceeding and to state to each of you I would have gone as long as possible to have this motion come before me before I ruled on that motion. I do not and did not want to see another person destroyed further by this proceeding."

her reputation as a legal secretary, and has apparently suffered substantial physical and emotional distress. To further involve her in these proceedings is unnecessary and contrary to the interests of justice."

Deliberate refusal to obey a lawfully issued subpoena to attend a deposition is punishable as a contempt without the necessity of a prior order directing compliance. (Code Civ. Proc., §§ 1991.1, 2034, subd. (b)(1)(i).) ▆▆ The trial court's ruling that Jane Doe's deposition was "unnecessary" simply cannot be reconciled with the court's concomitant conclusion that appellants failed to provide sufficient evidence warranting disqualification, and constitutes an abuse of discretion.

Jane Doe is unquestionably the most important witness on the central question whether she revealed confidential information to Foley that might affect the outcome of the litigation. Moreover, as noted, the description in Jane Doe's declaration of her relationship with Foley and the substance of their conversations conflicts with declarations of others. The nature of the relationship is important, because disclosure would be more likely if the two formed a strong emotional bond than if they only engaged in casual social contacts. (See *People* v. *Jackson, supra,* 167 Cal.App.3d 829, 832; see also, Comment, *Ethical Concerns of Lawyers Who Are Related by Kinship or Marriage* (1981) 60 Ore. L. Rev 399.) Finally, considering that it is ordinarily difficult for parties excluded from a series of communications to establish the substance of what was communicated, it is unfair to constrict the discovery rights of such parties out of sympathy and concern for others. Appellants show no desire to embarrass Jane Doe and agreed to several measures to limit any emotional distress or further damage to reputation that a deposition might entail.

At the same time they sought to compel Jane Doe to submit to deposition, the Bank and Directors also moved for an order compelling Foley to answer numerous specific questions he refused to answer at his deposition. (See Cal. Rules of Court, rule 335a.) This motion was denied without explanation when the court denied the application pertaining to Jane Doe.

This denial is also unjustified, and for much the same reasons as relate to the court's refusal to compel Jane Doe to submit to deposition. The questions Foley refused to answer are far too numerous to recount. Most consisted of questions he claimed were either irrelevant or involved matters protected by the work product privilege. On privacy grounds, Foley also refused to answer questions relating to conversations he believed unrelated to the pending litigation. As stated by Foley's counsel: "to the extent that Mr. Foley has had any non-business related activity or conversations, con-

tact with Jane Doe or anybody else, we will refuse to answer those questions on the basis of the constitutional right to privacy . . . ."

We need not assess the propriety of the questions Foley refused to answer because the trial court has not first done so. Suffice it for us simply to observe that the work product privilege is not as expansive as Foley has sometimes claimed. The policy of this privilege is to "(1) . . . encourage [attorneys] to prepare their cases thoroughly and to investigate not only the favorable but the unfavorable aspects of those cases; and (2) to prevent attorneys from taking undue advantage of their adversary's industry and efforts." (Code Civ. Proc., § 2018, subd. (a).) These policies do not, for example, justify Foley's repeated refusal to explain his interest in the "personal lives" of opposing counsel. Moreover, except for certain writings,[16] the work product of an attorney is discoverable if the court "determines that denial of discovery will unfairly prejudice the party seeking discovery in preparing that party's claim or defense or will result in an injustice." (Code Civ. Proc., § 2018, subd. (b).) Keeping in mind that Foley should not have initiated and maintained an undisclosed relationship with Jane Doe during the course of the litigation, any genuine doubts as to application of the work product privilege should not be resolved in his favor.

■■■ The right of privacy, upon which Foley also relied heavily, is not absolute and under some circumstances disclosure may permissibly be compelled. (*Britt* v. *Superior Court* (1978) 20 Cal.3d 844, 855 [143 Cal.Rptr. 695, 574 P.2d 766].) Abridgment of the constitutional right has sometimes been justified in order to serve "the historically important state interest of facilitating the ascertainment of truth in connection with legal proceedings.' " (*Id.,* at p. 857, quoting *In re Lifschutz* (1970) 2 Cal.3d 415, 432 [85 Cal.Rptr. 829, 467 P.2d 557, 44 A.L.R.3d 1].) This interest is particularly strong here, where discovery is being resisted by an attorney whose inappropriate conduct created the issue the discovery is designed to resolve. The right to privacy of such an attorney is not the sort that courts have been at pains to protect in the context of civil discovery proceedings. (Cf. *El Dorado Savings & Loan Assn.* v. *Superior Court* (1987) 190 Cal.App.3d 342 [235 Cal.Rptr. 303]; *Kahn* v. *Superior Court* (1987) 188 Cal.App.3d 752 [233 Cal.Rptr. 662].)

For the foregoing reasons, the order denying the motion for disqualification is affirmed, the orders refusing to compel the deposition of Jane Doe and to compel Foley to answer questions propounded at deposition are reversed.

---

[16] "Any writing that reflects an attorney's impressions, conclusions, opinions, or legal research or theories shall not be discoverable under any circumstances." (Code Civ. Proc., § 2018, subd. (c).)

McCarty, J.,* concurred.

**BENSON, J.,** Concurring and Dissenting.—The majority correctly determine that the trial court abused its discretion in denying appellant's motion for further discovery regarding the relationship and discussions between attorney Foley and appellant's case administrator. I concur in that aspect of the opinion.

Implicit in this court's reversal of the trial court's order denying further discovery lies an acknowledgement that when the trial court denied the motion to disqualify it was acting on an incomplete record. Having failed to compel the discovery to which appellants were lawfully entitled, the trial court's action on the disqualification motion was, at best, premature. The majority now compound this error by upholding a lower court decision which should not have been made in the first instance. In doing so my colleagues offer an advisory opinion on an incomplete record, to which I dissent.

A leading California case on the subject of judicial discretion, *Gossman* v. *Gossman* (1942) 52 Cal.App.2d 184 [126 P.2d 178], observes: ". . . The mere fact that a court may have jurisdiction to make an order does not equip it to exercise *judicial discretion.* Its acts must not only be confined within the field of *discretion* but must also be of a character within the bounds of the limiting adjective 'judicial.' To exercise that power all the material facts in evidence must be both known and considered, together also with the legal principles essential to an informed, intelligent and just decision. . . ." (*Id.* at p. 194, italics in original.)

Here, a party has been deprived of its right to gather all material facts relating to the disqualification issue. That deprivation resulted from the capricious action of the trial court. It is self evident that where all material facts are not before the court, through no fault of the party seeking to obtain the facts, the discretion exercised is not an *informed* discretion and the action taken must be repudiated as premature.

I am not willing to render a judgment on the effect of the conduct based on the record currently before us. This is not to say that I could not reach a judgment. However, knowing that the "socializing" and the discussions between attorney and case administrator will be subjected to further examination under oath, potentially resulting in additional evidence elaborating and defining the nature and extent of the transgression, I deem it imprudent for the majority to attempt to fashion a rule or guideline regarding

---

* Assigned by the Chairperson of the Judicial Council.

disqualification for conduct which remains, in great measure, unknown. The underlying issue has moral and ethical implications far too important to be treated by an advisory opinion on an incomplete record.

Moreover, I am fearful that the majority opinion may offer the trial judge more confusion than enlightenment when the disqualification motion is presumably renewed after a more complete record is developed. While the majority cites language from *Comden* v. *Superior Court* (1978) 20 Cal.3d 906 [145 Cal.Rptr. 9, 576 P.2d 971, 5 A.L.R.4th 562], on several occasions in its opinion, they are silent as to an important policy concept enunciated in the *Comden* decision. Specifically: "However, ultimately the issue involves a conflict between a client's right to counsel of his choice and the need to maintain ethical standards of professional responsibility. *'The preservation of public trust both in the scrupulous administration of justice and in the integrity of the bar is paramount. . . . [The client's recognizably important right to counsel of his choice] must yield, however, to considerations of ethics which run to the very integrity of our judicial process.'* (*Hull* v. *Celanese Corporation* (2d Cir. 1975) 513 F.2d 568, 572.)" (*Id.* at p. 915, italics added.)

In light of the above, I suggest that the majority opinion is too narrow and restrictive when it states, ". . . the significant question is whether there exists a genuine likelihood that the status or misconduct of the attorney in question will affect the outcome of the proceedings before the court." (Maj. opn., p. 309.) This standard has the vice of focusing attention on the end result of the misconduct and ignores completely what *Comden* stated to be a matter of *paramount* importance, i.e., "the preservation of public trust both in the scrupulous administration of justice and in the integrity of the bar.' "

Further confusion results from the majority's treatment of "appearance of impropriety" as a basis for disqualification. (Maj. opn., pp. 305-309.) While in the last analysis my colleagues appear to leave the concept intact, there is no doubt that they demean its significance in disqualification proceedings. This is unfortunate for much of the authority they rely upon, case law and commentary, is language uttered in the context of conflict of interest situations. The case before us is not a conflict of interest case. So far as they are known, the acts of Mr. Foley, characterized by the trial judge as "the essence of unprofessionalism and poor judgment," suggest the employment of guile and chicanery to reap an unfair advantage, tactics which directly assault the integrity of the judicial process and necessarily erode public trust and confidence in the administration of justice and the bar.

We are told by the majority that ". . . judges lack the empirical data necessary to accurately discern the views of the appropriate group" (to

whom the conduct in question must appear improper.) We are cited to Wolfram's treatise, *Model Legal Ethics* (which, in all fairness, was addressing appearance of impropriety in the context of conflict of interest problems) for the following comment: " '. . . But courts lack both access to reliable facts and a workable method for thinking through, on a case by case basis, the question whether the particular result sought by one or the other of the parties will increase, decrease, or leave unaffected the general level of public or client confidence.' " (Maj. opn., pp. 307-308.) Whether these statements are reliable authority when considering a conflict of interest problem is problematical at least. Here, however, they have no place whatever. I can think of no body more qualified to determine whether improper conduct has compromised the integrity of the judicial process than the judges who are sworn and entrusted to administer and preserve the process.

A petition for a rehearing was denied February 17, 1989, and the opinion was modified to read as printed above. Benson, J., was of the opinion that the petition should be granted. Respondents' petition for review by the Supreme Court was denied April 5, 1989. Lucas, C. J., and Panelli, J., did not participate therein.