Filed 12/30/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| JAMES J. M'GUINNESS,<br><br>      Plaintiff, Cross-Defendant and<br>Appellant,<br><br>            v.<br><br>STEVEN JOHNSON,<br><br>      Defendant, Cross-Complainant and<br>Respondent;<br><br>SCOTT STUART et al.,<br>      Cross-Complainants, Cross-<br>      Defendants and Appellants. | No. H040614<br>(Santa Clara County<br>Super. Ct. No. CV239996) |

James J. M'Guinness brought suit in 2013 against his fellow shareholder, Steven Johnson, for breach of fiduciary duty and other claims arising out of the operation of a small construction firm, Think It, Love It, Construct It, Inc. (TLC). M'Guinness also named TLC in the suit. The claims against TLC included involuntary dissolution of the corporation and the appointment of a receiver. Johnson cross-complained against M'Guinness, TLC, and the third TLC shareholder, Scott Stuart. Johnson was represented by the law firm of Casas, Riley & Simonian, LLP (Law Firm or Firm).

M'Guinness, Stuart, and TLC (collectively, Appellants) moved to disqualify the Law Firm. They contended the Firm had been retained by TLC as its counsel in 2006, TLC had never discharged the Firm, and the Firm had never withdrawn as counsel. Appellants argued that because of the Law Firm's concurrent representation of TLC and

Johnson, the Firm had a conflict of interest that required its disqualification in this case. Appellants argued, alternatively, that even if the Law Firm were no longer TLC's counsel, the Firm's representation of Johnson constituted a subsequent conflict of interest that required the Firm's disqualification because of the substantial similarities between the prior corporate representation and the current suit. Johnson opposed the motion, contending (1) the Law Firm ceased representing TLC, (2) there was no substantial relationship between the Firm's prior representation of TLC and the current litigation, and (3) Appellants prejudicially delayed in filing the motion and therefore waived their right to pursue it.

The court denied the disqualification motion on the first two grounds asserted by Appellants. It found, among other things, that the evidence was insufficient to warrant automatic disqualification based upon a concurrent representation conflict of interest. In doing so, it reasoned that "[b]ecause disqualification is a drastic measure, it is generally disfavored and should only be imposed when absolutely necessary." The court also rejected Appellants' contention that the Law Firm should be disqualified on the ground that it had a subsequent representation conflict of interest. In their appeal, Appellants assert the trial court abused its discretion in denying their motion. (See *Metro-Goldwyn-Mayer, Inc. v. Tracinda Corp.* (1995) 36 Cal.App.4th 1832, 1838 (*MGM*) [order denying motion to disqualify is an appealable order].)

We conclude the trial court abused its discretion in denying the motion to disqualify. The undisputed facts demonstrate that the Law Firm continued to represent TLC through the time the lawsuit was instituted. If a party moving to disqualify an attorney establishes concurrent representation, the court is required, "in all but a few instances," to automatically disqualify the attorney without regard to whether the subject matter of the representation of one client relates to the representation of a second client in the lawsuit. (*Flatt v. Superior Court* (1994) 9 Cal.4th 275, 284-285 (*Flatt*).) Thus, the Law Firm should have been automatically disqualified. (*Ibid.*)

2

We also conclude that, while disqualification is a drastic measure and motions to disqualify are sometimes brought by litigants for improper tactical reasons, disqualification is not "generally disfavored." Indeed, when the circumstances of a disqualifying conflict exist—such as here, where the Law Firm concurrently represented TLC at the time it appeared on behalf of Johnson in this litigation—disqualification is required. (*Flatt*, *supra*, 9 Cal.4th at pp. 284-285.) Accordingly, we will reverse and remand to the trial court with directions that it vacate its prior order and enter a new order granting Appellants' motion to disqualify the Law Firm.[1]

PROCEDURAL BACKGROUND

This action involves a complaint and three cross-complaints arising out of the operation of TLC. The pleadings reflect that M'Guinness, Johnson, and Stuart each own one-third of the outstanding stock of TLC, and that each is an officer and director of the corporation.

On January 23, 2013, M'Guinness filed a complaint against Johnson and TLC, alleging five causes of action. As against TLC, M'Guinness alleged a claim for involuntary dissolution due to (1) a deadlock in its business operations, (2) Johnson's appropriation of control of the company, and (3) Johnson's mismanagement of the business. M'Guinness alleged causes of action against Johnson for breach of fiduciary duty, fraudulent concealment, and unjust enrichment arising out of Johnson's operation of TLC's business and his alleged diversion of corporate opportunities. And, as against both Johnson and TLC, M'Guinness sought the appointment of a receiver or the issuance of an injunction.

---

[1] Prior to filing this appeal, M'Guinness, Stuart, and TLC, as petitioners, filed a petition for writ of mandate, prohibition, or other extraordinary relief, challenging the order denying disqualification. (*M'Guinness et al. v. Superior Court*, H040254.) The briefing in the mandamus proceeding contained issues and arguments identical to those raised in this appeal. Accordingly, immediately after filing the instant opinion, we will file an order denying the mandamus petition as moot.

On or about February 28, 2013, Johnson, represented by the Law Firm, filed an answer to the complaint. He also filed a cross-complaint, apparently naming M'Guinness and Stuart as cross-defendants.[2] On or about April 19, 2013, Johnson, through the Firm, filed a first amended cross-complaint against M'Guinness, Stuart, and TLC, alleging five causes of action for (1) breach of fiduciary duty against M'Guinness, (2) conversion against M'Guinness, Stuart, and TLC, (3) breach of contract against M'Guinness, Stuart, and TLC, (4) money had and received against TLC, and (5) for an accounting against TLC.

Cross-complaints were thereafter filed on behalf of TLC and Stuart. TLC filed a cross-complaint against M'Guinness, Stuart, and Johnson seeking declaratory relief. Stuart filed a cross-complaint against Johnson and TLC that mirrored M'Guinness's complaint. Stuart alleged a claim for involuntary dissolution against TLC; claims of breach of fiduciary duty, fraud, and unjust enrichment against Johnson; and a claim for appointment of a receiver or for preliminary injunction against TLC and Johnson.

Appellants M'Guinness, Stuart, and TLC filed a joint motion to disqualify the Law Firm on May 31, 2013. They contended the Firm had represented TLC continuously since May 2006, and that the Firm had "impermissible conflicts of interest based on [its] concurrent and prior representation of TLC" that precluded it from representing Johnson in the litigation.

Johnson, represented by the Law Firm, opposed the motion. He argued, among other things, that (1) the Firm had "concluded its representation of TLC in early March 2012—months before the instant dispute arose"; and (2) any prior representation of TLC did not create a conflict of interest in the Firm's representation of Johnson in the current

---

[2] The original cross-complaint is not part of the record. Based upon the caption of Johnson's answer, we discern that M'Guinness and Stuart were named as cross-defendants in the original cross-complaint.

litigation because its "prior engagements, arising primarily from TLC's interactions with its customers, have nothing to do with this action."

The court heard argument on the motion on July 23, 2013. In its order dated September 20, 2013, the court denied the motion to disqualify.

DISCUSSION

I.      *Timeliness of Appeal*

Johnson contends that Appellants' notice of appeal was not timely filed. He has not filed a separate motion to dismiss to have us address this question. But because the timely filing of a notice of appeal is a jurisdictional prerequisite for our review (*Van Beurden Ins. Services, Inc. v. Customized Worldwide Weather Ins. Agency, Inc.* (1997) 15 Cal.4th 51, 56), and we must dismiss an untimely appeal either upon motion of a party or upon our own motion (*Hollister Convalescent Hosp., Inc. v. Rico* (1975) 15 Cal.3d 660, 667), we will address Johnson's contention.

The order denying Appellants' motion to disqualify was dated September 18, 2013, and file-endorsed September 20, 2013. The record indicates a corrected proof of service by the trial court dated September 20, 2013, reflecting that the clerk mailed copies of the order to all counsel on that date. No notice of entry of the order was served by the court or by any of the parties. Appellants filed their notice of appeal on January 14, 2014.

Johnson argues the notice of appeal was required to have been filed within 60 days of September 20, 2013, the date the order was filed and served by the clerk of the court. Because the notice was not filed until January 14, 2014—nearly two months *after* the jurisdictional deadline of November 19, 2013—he contends the appeal is untimely.

Unless an exception applies, a party must file a notice of appeal of a civil judgment or other appealable order 180 days after entry of the judgment or order. There are three exceptions to that time frame—two resulting from actions taken by the clerk and the third resulting from action by one of the parties. The general rule and the three

5

exceptions are specified in the California Rules of Court, as follows: "[A] notice of appeal must be filed on or before the earliest of: [¶] (A) 60 days after the superior court clerk serves on the party filing the notice of appeal a document entitled 'Notice of Entry' of judgment or a file-stamped copy of the judgment, showing the date either was served; [¶] (B) 60 days after the party filing the notice of appeal serves or is served by a party with a document entitled 'Notice of Entry' of judgment or a file-stamped copy of the judgment, accompanied by proof of service; or [¶] (C) 180 days after entry of judgment." (Cal. Rules of Court, rule 8.104(a)(1).)[3]

There is no record (or argument by Johnson) that any party served a notice of entry of the disqualification order. We are thus concerned only with whether the service of documents by the court clerk satisfied rule 8.104(a)(1)(A), thereby triggering the 60-day appeal period of September 20, 2013. More specifically, the issue is whether the court clerk's service of the file-endorsed order, either separately or in conjunction with service of the "corrected proof of service," constituted service of "a file-stamped copy of the judgment, showing the date [the judgment] was served." (Rule 8.104(a)(1)(A).) The Supreme Court's decision in *Alan v. American Honda Motor Co., Inc.* (2007) 40 Cal.4th 894 (*Alan*) informs us the answer is "No."

In *Alan*, the question was whether the plaintiff had timely filed his notice of appeal from the trial court's order denying class certification. (*Alan*, *supra*, 40 Cal.4th at p. 898.) The controversy was based upon "the idiosyncratic manner in which the superior court [clerk] informed the parties of [the] order." (*Ibid.*) The clerk had mailed two documents on the same day; neither mailing had satisfied the alternative ways the 60-day appeal period could be triggered under former rule 8.104(a)(1). (*Ibid.*)[4] The two

---

[3] All rule references are to the California Rules of Court unless otherwise specified.

[4] At the time *Alan* was decided, the relevant language of rule 8.104 read: "(1) 60 days after the superior court clerk *mails* the party filing the notice of appeal a document

6

documents were (1) a file-stamped statement of decision indicating the court's reasons for denying certification; and (2) a minute order indicating the motion had been heard and disposed of by the court through a statement of decision, and that copies of the statement of decision and minute order were being mailed to counsel on January 2, 2003. (*Ibid.*)

The Supreme Court held that the phrase "showing the date either was mailed"— which under current rule 8.104(a)(1)(A) reads "showing the date either was *served*" (italics added)—was ambiguous. (*Alan*, *supra*, 40 Cal.4th at p. 900.) It applied the principles of statutory construction, including application of "the well-established policy . . . of 'according [the] right [to appeal] in doubtful cases "when such can be accomplished without doing violence to applicable rules." ' " (*Id.* at p. 901.) The Court held that under former rule 8.104(a)(1), "the 60-day period for filing a notice of appeal [applies] only when the clerk has sent a single, self-sufficient document satisfying all of the rule's conditions." (*Id.* at p. 903.) Our high court thus rejected the defendant's contention in *Alan* that the two documents served by the court clerk should be considered together to establish compliance with former rule 8.104(a)(1). It concluded that while "[former] rule 8.104(a)(1) does indeed require a single document—either a 'Notice of Entry' so entitled or a file-stamped copy of the judgment or appealable order—that is sufficient in itself to satisfy all of the rule's conditions, including the requirement that the document itself show the date on which it was mailed. . . . [T]he rule does not require litigants to glean the required information from multiple documents or to guess, at their peril, whether such documents in combination trigger the duty to file a notice of appeal.

---

entitled 'Notice of Entry' of judgment or a file-stamped copy of the judgment, showing the date either was *mailed*." (Former rule 8.104(a)(1), italics added.) The rule was amended in 2010 to change "mails" to "serves," and "mailed" to "served." (Rule 8.104, as amended eff. Jan. 1, 2010.) The changes have no impact upon the application of *Alan*'s reasoning in determining that the notice of appeal was timely filed.

7

'Neither parties nor appellate courts should be required to speculate about jurisdictional time limits.' [Citation.]" (*Alan*, at p. 905.)

In this instance, neither document served by the court clerk on September 20, 2013, was entitled "Notice of Entry." Likewise, the order denying the disqualification motion, file-endorsed September 20, 2013, did not "show[] the date [it] was served." (Rule 8.104(a)(1)(A).) Based upon the holding in *Alan*, *supra*, 40 Cal.4th at page 905, we conclude the file-endorsed copy of the order cannot be read in conjunction with the separate document—the "corrected proof of service"—to satisfy the requirements of Rule 8.104(a)(1)(A). Accordingly, the 60-day period for filing an appeal was not triggered, and Appellants' notice of appeal was timely filed within the 180-day period provided in Rule 8.104(a)(1)(C). (See *Bi-Coastal Payroll Services, Inc. v. California Ins. Guarantee Assn.* (2009) 174 Cal.App.4th 579, 586-587 [following *Alan*, *supra*, 40 Cal.4th 894, holding that 60-day appeal period was not triggered because there was not strict compliance by the court clerk with former rule 8.104(a)(1)].)

## II. *Motions to Disqualify Counsel*

A trial court is empowered to disqualify counsel through its inherent power "[t]o control in furtherance of justice, the conduct of its ministerial officers, and of all other persons in any manner connected with a judicial proceeding before it, in every manner pertaining thereto." (Code Civ. Proc., § 128, subd. (a)(5); see *In re Complex Asbestos Litigation* (1991) 232 Cal.App.3d 572, 586.) A motion to disqualify counsel may implicate several important interests, including "a client's right to chosen counsel, an attorney's interest in representing a client, the financial burden on a client to replace disqualified counsel, and the possibility that tactical abuse underlies the disqualification motion. [Citations.]" (*People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc.* (1999) 20 Cal.4th 1135, 1144-1145 (*SpeeDee Oil*).) At its core, a motion to disqualify "involve[s] a conflict between the clients' right to counsel of their choice and the need to maintain ethical standards of professional responsibility. [Citation.] The

8

paramount concern must be to preserve public trust in the scrupulous administration of justice and the integrity of the bar. The important right to counsel of one's choice must yield to ethical considerations that affect the fundamental principles of our judicial process. [Citations.]" (*Id.* at pp. 1145-1146; see also *Comden v. Superior Court of L.A. County* (1978) 20 Cal.3d 906, 915 (*Comden*).)

California courts have identified two separate categories in which actual or potential conflicts of interest arise in counsel's representation of multiple clients. One is the successive representation of multiple clients resulting in a conflict of interest, i.e., where the attorney's representation of the current client may conflict with the interests of a former client (hereafter, successive representation). Under those circumstances, "the courts have recognized that the chief fiduciary value jeopardized is that of client *confidentiality*." (*Flatt*, *supra*, 9 Cal.4th at p. 283, original italics.) The other circumstance is the concurrent (or dual) representation of multiple clients resulting in a conflict of interest (hereafter, concurrent representation), in which "[t]he primary value at stake . . . is the attorney's duty—and the client's legitimate expectation—of *loyalty*, rather than confidentiality." (*Id.* at p. 284, original italics.)

The attorney's obligation to maintain client confidences—the duty central to successive representation conflicts—is confirmed by California statute. Business and Professions Code section 6068, subdivision (e) provides: "It is the duty of an attorney to do all of the following: [¶] . . . [¶] (e)(1) To maintain inviolate the confidence, and at every peril to himself or herself to preserve the secrets, of his or her client." This obligation survives the termination of the attorney-client relationship (*SpeeDee Oil*, *supra*, 20 Cal.4th at pp. 1144-1145). The attorney's duty of loyalty to his or her client— the duty central to concurrent representation conflicts—is specified in the California Rules of Professional Conduct. (Rules Prof. Conduct, rule 3–310(C) & (E); see *City and County of San Francisco v. Cobra Solutions, Inc.* (2006) 38 Cal.4th 839, 846 (*Cobra Solutions*).) "Normally, an attorney's conflict is imputed to the law firm as a whole on

9

the rationale 'that attorneys, working together and practicing law in a professional association, share each other's, and their clients', confidential information.' [Citation.]" (*Id.* at pp. 848-849, quoting *SpeeDee Oil*, at pp. 1153-1154.)

In successive representation cases, where the former client seeks to disqualify counsel from representing a successive client in current litigation adverse to the former client's interest, the former client must "demonstrate a '*substantial relationship*' between the subjects of the antecedent and current representation." (*Flatt*, *supra*, 9 Cal.4th at p. 283, original italics.) A substantial relationship exists where "the attorney had a direct professional relationship with the former client in which the attorney personally provided legal advice and services on a legal issue that is closely related to the legal issue in the present representation. [Citation.]" (*Cobra Solutions, supra*, 38 Cal.4th at p. 847.) But "[w]hen the attorney's contact with the prior client was not direct, then the court examines both the attorney's relationship to the prior client and the relationship between the prior and the present representation. If the subjects of the prior representation are such as to 'make it likely the attorney acquired confidential information' that is relevant and material to the present representation, then the two representations are substantially related. [Citations.]" (*Ibid.*)

In instances of concurrent representation, "[b]ecause a conflict involving an attorney's duty of loyalty is '[t]he most egregious' kind of conflict," a " 'more stringent' " test is applied. (*In re Charlisse C.* (2008) 45 Cal.4th 145, 160, quoting *SpeeDee Oil, supra*, 20 Cal.4th at p. 1147.) Even if the dual representations "may have *nothing* in common, and there is *no* risk that confidences to which counsel is a party in the one case have any relation to the other matter, disqualification may nevertheless be *required*. Indeed, in all but a few instances, the rule of disqualification in simultaneous representation cases is a *per se* or 'automatic' one. [Citations.]" (*Flatt*, *supra*, 9 Cal.4th at p. 284, original italics; see also *Cobra Solutions, supra*, 38 Cal.4th at p. 846 ["attorney who seeks to simultaneously represent clients with directly adverse interests in the same

10

litigation will be automatically disqualified"].)  This *per se* rule is appropriate because "[a] client who learns that his or her lawyer is also representing a litigation adversary, even with respect to a matter *wholly unrelated* to the one for which counsel was retained, cannot long be expected to sustain the level of confidence and trust in counsel that is one of the foundations of the professional relationship."  (*Flatt*, *supra*, 9 Cal.4th at p. 285, original italics; see also *MGM*, *supra*, 36 Cal.App.4th at p. 1840.)

A trial court's ruling on a motion to disqualify counsel is generally reviewed for abuse of discretion.  (*SpeeDee Oil*, *supra*, 20 Cal.4th at p. 1143.)  Where the trial court resolves a matter by considering disputed factual issues, the appellate court does not substitute its judgment for that of the trial court, and its express and implied findings will be upheld if supported by substantial evidence.  (*Ibid.*)  If the court's findings are supported by substantial evidence, the appellate court reviews those findings under an abuse of discretion standard.  (*Id.* at p. 1144.)  But "the trial court's discretion is limited by the applicable legal principles . . . [and] where there are no material disputed factual issues, the appellate court reviews the trial court's determination as a question of law. [Citation.]"  (*Ibid.*)  Further, "the trial court's conclusions of law . . . [are] review[ed] . . . de novo; a disposition that rests on an error of law constitutes an abuse of discretion. [Citations.]"  (*In re Charlisse C.*, *supra*, 45 Cal.4th at p. 159.)

### III.    *The Court Erred in Denying the Disqualification Motion*

#### A.    Facts Relevant to the Motion to Disqualify

The essential facts regarding the relationship between the parties are undisputed. TLC was incorporated in April 2002.  Since the inception of the corporation, Johnson, M'Guinness and Stuart have each been officers, directors, and one-third shareholders of TLC.

In or about May 2006, TLC retained the Law Firm.  The engagement arose after Johnson obtained the Law Firm's standard client agreement from Dan Casas, a partner in the Firm.  Johnson sent the agreement by email to M'Guinness and Stuart on May 2,

11

2006, stating: "Here is the standard form for the retainer for the construction, development attorney I met with. If we do the Jones [*sic*,] I definitely want him involved as well as for developing. Questions like costs plus, terms, % we can charge for late payments, leans [*sic*], etc." The client agreement (discussed in detail in part B.1., *post*), contained provisions for, among other things, the nature of the legal representation, the circumstances under which the relationship would terminate, and a requirement for a client deposit.

The Law Firm handled specific legal matters for TLC from 2006 to 2012. As summarized in the supporting declaration of M'Guinness, the Law Firm represented TLC in connection with (1) a 2006 project involving whether TLC could legally do construction work on a cost-plus basis; (2) a 2006 dispute with a TLC client who threatened to file a complaint with the State Contractor's Licensing Board (Licensing Board); (3) a 2007 design-build project in which M'Guinness had concerns about whether he could do design work without an engineering or architect's license, as well as issues regarding limitations on advertising and lien rights; (4) a "[n]ew project" in 2008 as described in a telephone call from TLC to the Law Firm; (5) a 2008 dispute with a client regarding TLC's work; and (6) a 2011-2012 master bedroom/bathroom project that included an attempt by TLC to collect money due, the filing of a lien on TLC's behalf, and addressing a Licensing Board complaint.

The Law Firm, through Casas, notified M'Guinness's attorney at least as early as January 8, 2013, that it represented Johnson. At that time, Casas stated, "I don't believe that our law firm has a conflict that would affect our ability to represent Mr. Johnsons [*sic*] in connection with TLC issues." M'Guinness's attorney indicated in emails to Casas in January 2013 that M'Guinness reserved his right to object to the Firm's representation of Johnson. And on April 25, 2013, Stuart's attorney, Joseph Dozier, raised with Casas the issue of the Law Firm's conflict of interest in the litigation. Casas responded that there was no conflict of interest, and that the Law Firm had only

12

represented TLC in a minor collection matter. Neither M'Guinness nor Stuart approved any waiver by TLC of a conflict of interest with respect to the Law Firm's representation of Johnson in this litigation.

### B. Disqualification of Law Firm Was Required

#### 1. Concurrent Representation Existed

Appellants argued below that the Law Firm's representation of Johnson in the current litigation constituted an impermissible conflict of interest because of the Firm's ongoing representation of TLC. They argued, in the alternative, that even if the attorney-client relationship between TLC and the Law Firm had terminated prior to its representation of Johnson, the Law Firm should be disqualified based upon a successive representation conflict because of the substantial similarities between its prior corporate representation and the ongoing litigation.

Johnson responded by arguing, among other things, that the case did not involve concurrent representation because the Law Firm had "concluded its representation of TLC in early March 2012," and it did "not currently represent TLC in any matter whatsoever." (Original underscoring.) And he contended the Law Firm did not have a successive representation conflict because the issues in the ongoing litigation "involve[d] no facts that were implicated in the [Firm's] earlier representation[]" of TLC.

The trial court recited the parties' arguments on concurrent representation in its order denying the disqualification motion. It indicated that "[b]ecause disqualification is a drastic measure, it is generally disfavored and should only be imposed when absolutely necessary." It reasoned that the existence of regular invoices from the Firm through October 2012 "by themselves without any reference to ongoing work do not override the strong policy disfavoring disqualification." Therefore, it found "there [was] not sufficient evidence . . . to warrant automatic disqualification." Since automatic disqualification occurs only when there is concurrent representation, the trial court essentially found there was no concurrent representation. The trial court went on to

13

conclude that Appellants had also failed to meet their burden of establishing disqualification under a successive representation theory.

We disagree with the trial court's conclusion there is no concurrent representation in this case. The undisputed facts show the Law Firm had an ongoing relationship with TLC that required disqualification. (*Flatt*, *supra*, 9 Cal.4th at pp. 284-285.)

As noted earlier, Johnson's position in opposing the motion was that the Firm had "concluded its representation of TLC in early March 2012," and it did "not currently represent TLC in any matter whatsoever." (Original underscoring.) But this position is belied by (1) the specific terms of the client agreement, (2) the Law Firm's retention of TLC funds in the Firm's trust account, (3) the Law Firm's billing practices with respect to TLC, (4) the Law Firm's actions up through at least April 2013, and (5) the law addressing an attorney's role as counsel for a corporation.

### a. The Client Agreement

Fee agreements between attorneys and their clients "are evaluated at the time of their making [citation] and must be fair, reasonable and fully explained to the client. [Citations.] Such contracts are strictly construed against the attorney. [Citations.]" (*Alderman v. Hamilton* (1988) 205 Cal.App.3d 1033, 1037 (*Alderman*); see also *Severson & Werson v. Bolinger* (1991) 235 Cal.App.3d 1569, 1572.) Client agreements are construed by the court under traditional principles of contract interpretation (*Sayble v. Feinman* (1978) 76 Cal.App.3d 509, 512), and "any uncertainties [are resolved] in favor of a fair and reasonable interpretation." (*Ecco-Phoenix Electric Corp. v. Howard J. White, Inc.* (1969) 1 Cal.3d 266, 272.) If ambiguities are present in the engagement agreement, they are to be resolved "in favor of the client and against the attorney. [Citation.]" (*Banning Ranch Conservancy v. Superior Court* (2011) 193 Cal.App.4th 903, 913 (*Banning Ranch*).)

The Law Firm's client agreement provided: "Nature of Legal Representation: Advice and representation concerning TLC Builders, Inc., and other general legal work

14

directed by you from time to time." The agreement thus provided that the Firm's engagement was a broad and open-ended one. (Cf. Vapnek, et al., Cal. Practice Guide: Professional Responsibility (The Rutter Group 2015), ¶ 5:653, p. 5-135 [recommending that client agreement be drafted in a way that "any limitation on the work to be performed . . . be stated explicitly and completely"].) That the Firm's engagement was not a limited one is also evidenced by Johnson's email to M'Guinness and Stuart in May 2006 in which Johnson identified Casas as a "construction, development" attorney and enumerated several subjects for which Casas would provide counsel to TLC.

In the fifth paragraph of the client agreement, the Firm provided: "You may terminate our relationship at any time. We may withdraw from representation with your consent or for good cause. . . . At the conclusion of our engagement, at your request and at your cost for any file review, copy and delivery charges, we will review and deliver your files to you, along with any of your funds or property in our possession, charged at our hourly rate."

The terms of the agreement thus evidenced the parties' intent to establish an ongoing attorney-client relationship of an open-ended nature, terminable only by specific methods described in the agreement and under conditions that included the Firm's return of all property and funds to the client. Construing the agreement in a fair and reasonable manner at the time of its making (*Alderman*, *supra*, 205 Cal.App.3d at p. 1037), it is not reasonably susceptible to an interpretation that the Law Firm's representation terminated upon completion in March 2012 of its last specific engagement for TLC. Furthermore, there is no evidence TLC terminated its relationship with the Law Firm at any time. Nothing in the record indicates the Law Firm withdrew from the engagement (either with or without the client's consent). (Cf. 1 Mallen & Smith, Legal Malpractice (2015 ed.) Preventing and Mitigating Legal Malpractice Claims—General Principles, § 2:45, p. 116 [recommending sending client an "end-of-engagement letter" to "prevent confusion about whether the law firm's representation has ended"]; see also *Mindscape, Inc. v. Media*

15

*Depot, Inc.* (N.D. Cal. 1997) 973 F.Supp. 1130, 1133 [law firm disqualified in copyright infringement action due to concurrent representation because, among other things, firm never advised client "it considered its representation terminated"].)  Therefore, under the express language of the agreement, the relationship between the Firm and TLC extended into 2013 when this litigation commenced.

Johnson argued below, citing *Banning Ranch*, *supra*, 193 Cal.App.4th 903, that the Firm's client agreement was a "framework agreement" under which there was no ongoing attorney-client relationship.  We will not address this argument, as the trial court did not base its decision on this ground, and Johnson does not renew the argument on appeal.  (*Tiernan v. Trustees of Cal. State University & Colleges* (1982) 33 Cal.3d 211, 216, fn. 4 [appellate court treats as abandoned arguments made at trial level that are not asserted on appeal].)  In any event, *Banning Ranch* is distinguishable, and the undisputed facts here show that the Firm's agreement with TLC was not a framework agreement.

b.       Retention of Client Funds

The Firm, pursuant to the client agreement, required TLC to provide a so-called $2,500 "retainer [that], as well as any future deposits, will be deposited into a trust account and will be applied to legal fees and expenses incurred on your behalf. . . . You agree to maintain your retainer at $2500.00 for the duration of our representation."[5]  The agreement specified that, "[a]t the conclusion of our engagement, . . . [TLC's] funds or property in [the Firm's] possession" would be delivered to TLC.

---

[5] The Firm's reference to this initial client payment as a "retainer" was a misnomer.  "[A] 'true' or 'classic' retainer is a sum of money paid up front by a client to an attorney *to secure his or her availability* for a given period of time.  [Citations.]" (Vapnek, et al., Cal. Practice Guide: Professional Responsibility, *supra*, ¶ 5:255, p. 5-39, original italics.)  The retainer is earned by the attorney when it is paid.  (*Id.* at ¶ 5:257, p. 5-40.)  The client payment labeled here as a "retainer" was a deposit to secure payment for future legal services.  (*Id.* at ¶¶ 5:277 to 5281, p. 5-45.)

16

The last invoice in the record, which was dated October 25, 2012, showed a balance of $1,417 held by the Firm in its client trust account. Notwithstanding the agreement's language that the Firm would return its client's funds "[a]t the conclusion of [the] engagement," there is no evidence the Law Firm, in fact, returned TLC's $1,417 deposit.[6] In fact, Johnson's opposition, which included declarations from three attorneys of the Firm, was silent regarding the funds in the client trust account noted in the Firm's October 25, 2012 invoice. (See Rules Prof. Conduct, rule 3–700(D)(2) [upon discharge, attorney has duty to "[p]romptly refund any part of a fee paid in advance that has not been earned"]; Vapnek, et al., Cal. Practice Guide: Professional Responsibility, *supra*, ¶ 5:281, p. 5-45.) The Firm's retention of TLC's funds supports the conclusion that the attorney-client relationship was ongoing.

c.     Law Firm Invoices

The Law Firm's billings to TLC also refute Johnson's position that the Firm had terminated its relationship with TLC in March 2012. In support of the motion to disqualify, Appellants submitted the declaration of Laura M'Guinness (appellant M'Guinness's wife, and the office manager and bookkeeper for TLC). In her declaration, Laura[7] attached copies of 69 invoices from the Law Firm to TLC. These invoices spanned the time frame from July 25, 2006, to October 25, 2012. Based upon the invoices and the declarations submitted in support of the motion, there were at least six discrete matters in which the Law Firm represented TLC during that period.

The Firm's having consistently sent invoices to TLC between July 2006 and October 2012 belies Johnson's claim the Firm had "concluded its representation of TLC in early March 2012." In fact, there were at least seven months of billings (including the

---

[6] Johnson's counsel at oral argument indicated that the Law Firm continues to retain TLC's funds in its client trust account pending dissolution of the corporation.

[7] We refer to Laura M'Guinness by her first name to avoid confusion.

March 25, 2012 invoice) sent to TLC *after* the Firm's representation of TLC had, according to Johnson, "concluded" in early March 2012. In addition, there were several periods of time before 2012 in which the Law Firm sent invoices to TLC for successive months in which there were no new legal services rendered, and the invoices simply reflected a carry-forward balance of TLC funds held in the Firm's client trust account. Were Johnson's contention credited, we would have to conclude—notwithstanding the language of the client agreement, the Firm's retention of TLC's funds, and the Firm's consistent invoicing practice—that there were several periods of time in which the Firm had "concluded" its representation of TLC.

Johnson also argued below that the "modest 25.3 hours of services for TLC" that were rendered by the Law Firm over the years militated against a finding that the Firm had an ongoing relationship with the corporation. The trial court indicated at the hearing that the limited number of hours of work "was somewhat influential to [its] decision." We are not persuaded by this argument. (See *SpeeDee Oil*, *supra*, 20 Cal.4th at p. 1148: " 'Even the briefest conversation between a lawyer and a client can result in the disclosure of confidences.' ")

We conclude the Law Firm's invoicing practice shows the Firm and TLC had an ongoing relationship in 2013 when the Firm appeared as counsel for Johnson in this case. (See *Banning Ranch*, *supra*, 193 Cal.App.4th at p. 915 [predispute conduct of party " 'may reveal what the parties understood and intended [contract] terms to mean' "].)

### d. Law Firm's Other Conduct

The Law Firm also took several actions in 2013—on the eve of, and after commencement of the current litigation—indicative of its continued representation of TLC.

TLC's offices were located at 389 First Street in Los Altos. Since approximately 1998, Johnson had operated various business ventures at this address, including SJR Ventures, a development entity controlled by Johnson that the Law Firm had

18

incorporated in August 2008. In December 2012, Johnson changed the locks to the offices, preventing access by M'Guinness and Stuart. Thereafter, on January 7, 2013, Johnson granted access to M'Guinness and Stuart for the sole purpose of retrieving their personal property. Johnson was at the offices at that time with a person who identified himself as Greg Simonian. Johnson described Simonian as "one of his old football buddies." In fact, Simonian is a partner in the Law Firm, but neither Simonian nor Johnson identified this affiliation at the time. Simonian followed M'Guinness and Stuart while they were in the office and instructed them not to take any TLC property, including computers and files. Simonian's exertion of control over corporate property on January 7, 2013, supports the view that the Law Firm continued to represent TLC on that date.

On January 24, 2013 (the day after the lawsuit's filing), Ned Gelhaar, M'Guinness's attorney, wrote an email to Johnson's attorney, Casas, requesting that Casas advise: "(1) which party or parties your firm represents at this time; (2) which party or parties your firm represented on January 7, 2013, when your colleague Mr. Simonian was present at the [TLC's] office; and (3) when, if ever, your firm stopped representing TLC." Casas did not answer these questions, but on the same day, responded by email: "I have not yet looked at the possibility of representing TLC Builders in this case. I will do so today." On January 28, 2013, Gelhaar sent another email to Casas reiterating his three questions. Casas once again did not respond to the questions.

Had the Law Firm believed—as asserted in Johnson's opposition to the motion—that its engagement as TLC's counsel had ceased in March 2012, Casas could have so informed Gelhaar by responding to the third question in his email. Furthermore, by his email of January 24, 2013, Casas could be viewed as having implied that his Firm still represented TLC, since (1) he did not indicate the Firm had ceased its representation of TLC, and (2) he stated he would look into "the possibility of representing TLC Builders *in this case*." (Italics added.)

19

Lastly, beginning in January 2013, Gelhaar, on behalf of M'Guinness, attempted to gain access to TLC's corporate records by communicating directly with Casas. In an email dated January 9, Gelhaar requested the current accounts receivable and accounts payable records of TLC, indicating that "[a]ll backup financial records should also be made available on request." After the lawsuit was filed, Gelhaar sent several emails to Casas attempting to arrange for M'Guinness's access to TLC's corporate records.

On March 8, 2013, Gelhaar requested access to the records for a full day on March 13. He indicated that he and M'Guinness wanted to copy the "computer files," but because the records were voluminous, he proposed taking possession of them, reviewing them later, and copying what they needed. Gelhaar stated in his email: "I assume you will have no objection to this since all the directors have an equal right to possession of the documents (and you requested them from my client)." A dispute arose after Casas responded that he intended to be present for the inspection, the records would only be available for three hours, and that M'Guinness should "tag documents that he wants copied." On March 19, Gelhaar objected to the limitations placed on the document inspection by Casas. The document production did not occur until April 25, 2013.

The Law Firm's actions controlling and limiting access by two of TLC's shareholders, officers, and directors to the aforementioned records suggest the Firm continued to act as TLC's corporate counsel as late as April 2013.

> e. Corporate Counsel's Representation of Corporate Principals

The issue of corporate counsel's concurrent representation of a corporation's officers, directors, and shareholders has arisen in a number of cases. As a general proposition, an attorney for a corporation's first duty is to the corporate entity. (*MGM*, *supra*, 36 Cal.App.4th at p. 1842.) As such, there are instances in which corporate counsel may not also represent officers, directors or shareholders with whom the corporation has a conflict of interest. Examples of such instances include " 'where a shareholder has filed an action questioning [the corporation's] management or the actions

of individual officers or directors, such as in a shareholder derivative or . . . dissolution action.' " (*Havasu Lakeshore Investments, LLC v. Fleming* (2013) 217 Cal.App.4th 770, 778.) Likewise, a corporate attorney " 'must refrain from taking part in any controversies or factional differences which may exist among shareholders as to its control.' " (*Goldstein v. Lees* (1975) 46 Cal.App.3d 614, 622; see also *MGM*, *supra*, 36 Cal.App.4th at p. 1842.)

The issue in *Gong v. RFG Oil, Inc.* (2008) 166 Cal.App.4th 209 (*Gong*), for example, was whether the interests of a corporation conflicted with those of its 51-percent shareholder in a lawsuit by his brother, the minority 49-percent shareholder. (*Id.* at pp. 212, 215.) The plaintiff's claims included declaratory relief, involuntary dissolution of the corporation, and specific performance of a buy-sell agreement. (*Id.* at p. 215.) After the trial court severed the declaratory relief claim and determined that the majority shareholder was obligated under the buy-sell agreement to buy the plaintiff's stock at fair market value (*id.* at p. 213), the plaintiff moved to disqualify the law firm representing both the corporation and majority shareholder. (*Id.* at p. 216.) The plaintiff asserted that the corporation's role in the controversy was a significant one, and alleged the majority shareholder had abused his authority and had wasted corporate property. (*Ibid.*)

The appellate court noted that "case law forbids dual representation in a derivative suit alleging fraud by the principals, because the principals and the organization have adverse, conflicting interests." (*Gong*, *supra*, 166 Cal.App.4th at p. 215.) The court also observed that, although the plaintiff had not filed a derivative action, he had alleged that the corporation suffered damages as result of the majority shareholder's "personal use of corporate funds, and the dissolution claim threatens [the corporation's] corporate existence." (*Id.* at p. 216.) The court held that the minority shareholder's "allegations and the dissolution cause of action show that the interests of [the majority shareholder] and [the corporation] diverge" (*ibid.*), which required the disqualification of counsel who

21

was jointly representing the corporation and the majority shareholder. (*Id.* at p. 212; see also *Woods v. Superior Court* (1983) 149 Cal.App.3d 931, 936 [attorney's lengthy representation of closely held corporation precluded him from representing husband in dissolution proceedings because of attorney's ongoing representation of wife's interest in family business].)

Here, the record shows the Law Firm's representation of TLC had not terminated; therefore, the Firm's concurrent representation of TLC and Johnson as opposing parties in the litigation could not continue. Both M'Guinness and Stuart—like the minority shareholder in *Gong*—alleged claims of breach of fiduciary duty against Johnson that involved alleged self-dealing, diversion of corporate opportunities, and wasting of corporate assets that harmed TLC. Under these circumstances, the Law Firm could not defend Johnson against these claims because Johnson's interests conflicted with the interests of the corporation. Additionally, the Law Firm could not act as Johnson's counsel in pursuing his amended cross-complaint that included claims for money against TLC.

During oral argument, Johnson's counsel asserted that TLC did not have an active role in this case. Instead, he asserted, TLC was merely a stakeholder in a dispute between its three shareholders. But M'Guinness and Stuart alleged that Johnson committed acts that harmed TLC, and Johnson alleged tort claims against M'Guinness and Stuart that included allegations of self-dealing that harmed TLC. Johnson also alleged claims against TLC for money owed, belying the assertion that TLC did not have an active role in the litigation.

### f. Summary

We conclude the Law Firm represented TLC when the Firm appeared as counsel for Johnson in this case. The client agreement drafted by the Firm described an open-ended engagement that set forth the circumstances under which the attorney-client

22

relationship could be terminated. There was no evidence either party terminated the relationship. The client agreement also provided that the Firm would return any of the client's funds when the engagement ended, but the Law Firm continues to hold $1,417 of TLC's funds. The Firm's practice of invoicing TLC on a monthly basis through at least October 2012—seven months *after* Johnson claims the Firm ceased representing TLC—is further evidence the attorney-client relationship continued beyond March 2012. And the conduct of members of the Law Firm in 2013 was consistent with an ongoing relationship with TLC. Furthermore, as a matter of corporate law, the Firm's ongoing duty to TLC precluded its representation of Johnson in a lawsuit involving allegations in which the interests of the corporation diverged from those of shareholder litigants. (*Gong*, *supra*, 166 Cal.App.4th at pp. 215-216.) The undisputed facts therefore showed the Law Firm had a concurrent representation conflict of interest that required its disqualification as Johnson's counsel in this case. (*Flatt*, *supra*, 9 Cal.4th at pp. 284-285.)

### 2. Disqualification, Although a "Drastic Measure," Is Not "Generally Disfavored"

We begin by noting that the California Supreme Court has *not* held that a motion to disqualify based upon a concurrent representation conflict is a disfavored measure. It is true our high court has highlighted that a motion to disqualify may be misused by a litigant to delay or increase expense to an opponent rather than to prevent an attorney from impermissibly representing an opposing litigant due to a conflict of interest. (See *SpeeDee Oil*, *supra*, 20 Cal.4th at p. 1145 [disqualification motion may involve a number of considerations, including "the possibility that tactical abuse underlies the disqualification motion"]; *Comden*, *supra*, 20 Cal.3d at p. 915 [disqualification motion

23

"frequently a tactical device to delay litigation"].) Indeed, a moving party's delay in bringing a disqualification motion may be indicative of a tactical, rather than legitimate, reason for the attempt to disqualify opposing counsel. (See *Zador Corp. v. Kwan* (1995) 31 Cal.App.4th 1285, 1302; *In re Complex Asbestos Litigation*, *supra*, 232 Cal.App.3d at pp. 599-600.) In that sense, disqualification is "disfavored" in that courts should scrutinize whether the motion to disqualify has been brought for improper tactical reasons. (See *In re Complex Asbestos Litigation*, *supra*, at p. 599.)

But the California Supreme Court has made clear that, with few exceptions, there is a per se rule requiring disqualification of an attorney or a law firm when there is a conflict of interest based upon concurrent representation of multiple clients. (*Cobra Solutions, supra*, 38 Cal.4th at p. 846; *Flatt*, *supra*, 9 Cal.4th at pp. 284-285.) This is the case irrespective of whether the representation of one client has *anything to do with* the representation of the other client. (*Flatt*, supra, at p. 284.)

As noted, the trial court—echoing Johnson's opposition to the motion—stated that "[b]ecause disqualification is a drastic measure, it is generally disfavored and should only be imposed when absolutely necessary." The court reiterated that there is a "strong policy disfavoring disqualification" when it concluded that evidence of the Law Firm's having sent monthly invoices through October 2012 was insufficient to compel automatic disqualification.

In support of his position that disqualification is generally disfavored, Johnson relied upon the following language from a federal district court case: " 'Because disqualification is a drastic measure, it is generally disfavored and should only be imposed when absolutely necessary.' [Citations.]" (*UMG Recordings, Inc. v. MySpace, Inc.* (C.D. Cal. 2007) 526 F.Supp.2d 1046, 1062 (*UMG Recordings*), quoting *Concat LP v. Unilever, PLC* (N.D.Cal.2004) 350 F.Supp.2d 796, 814.) But application of the principle stated in *UMG Recordings* is not applicable to this case. First, the issue considered by the district court in *UMG Recordings* was whether a law firm should be

24

disqualified based upon a successive representation conflict. (*UMG Recordings*, *supra*, at pp. 1058-1060, 1063-1064; see also *id.* at p. 1064 ["OMM's representation of MySpace did not commence until *after* its representation of UMG ended"].) Second, the district court did not cite any California cases in support of the proposition that disqualification "is generally disfavored." (*Id.* at p. 1062.) And third, we "are not bound by federal decisions on matters of state law. [Citation.]" (*Haynes v. EMC Mortgage Corp.* (2012) 205 Cal.App.4th 329, 335.)

Johnson also relies on *Gregori v. Bank of America* (1989) 207 Cal.App.3d 291 (*Gregori*) to support his position that disqualification motions are disfavored. But that case did not involve a concurrent representation issue. Instead, it concerned a motion to disqualify based upon plaintiff's attorney having initiated an undisclosed personal relationship with a legal secretary who was familiar with the case and who was employed by defense counsel. (*Id.* at p. 295.) The court in *Gregori* merely acknowledged the Supreme Court's conclusion in *Comden*, *supra*, 20 Cal.3d at page 915 that courts should be mindful that disqualification motions may be filed for tactical reasons. (*Gregori*, at pp. 300-301.) *Gregori* cannot be read as establishing that the per se disqualification rule for concurrent representation conflicts is negated by the supposedly disfavored nature of disqualification motions.

Furthermore, *Roush v. Seagate Technology, LLC* (2007) 150 Cal.App.4th 210 (*Roush*) cannot be read to suggest that disqualification is "disfavored" when it is required. In *Roush*, there was neither concurrent nor successive representation since the party seeking disqualification was never a client of the challenged attorney. Counsel opposing the motion argued it was simply a delay tactic (*id.* at p. 216), and a panel of this court noted *in that context* that "disqualification is a drastic course of action" (*id.* at p. 219). We do not read *Roush* to suggest that the per se disqualification rule for concurrent

representation conflicts, as described by the California Supreme Court, is qualified by the view that disqualification is "disfavored." [8]

Finally, at oral argument, Johnson's counsel stated that the California Supreme Court held in *In re Charlisse C.*, *supra*, 45 Cal.4th 145 that disqualification is a disfavored remedy. The high court in *In re Charlisse C.*—a case involving a successive representation issue—reached no such conclusion. Rather, the court reaffirmed the principle that in the case of a concurrent representation conflict of interest, " 'disqualification . . . follows automatically, regardless of whether the simultaneous representations have anything in common.' " (*Id*. at p. 160, quoting *SpeeDee Oil*, *supra*, 20 Cal.4th at p. 1147.)

### 3. Conclusion

The undisputed evidence established that the Law Firm continued to represent TLC in 2013 when it undertook to represent Johnson in this litigation. The Firm therefore had an unwaived concurrent representation conflict of interest that compelled its disqualification. (*Flatt*, *supra*, 9 Cal.4th at pp. 284-285.) Having reviewed the trial

---

[8] Johnson also argued below that the motion should be denied because there was "an unreasonable, prejudicial delay in bringing [the] motion to disqualify," and appellants therefore waived their right to seek disqualification. Johnson renews this argument on appeal. In denying the motion, the trial court did not address this contention.

Johnson's contention is without merit. First, the purported unreasonable delay was approximately three months in duration: Johnson appeared in the case on February 28 and the disqualification motion was filed on May 31, 2013. This, on its face, does not suggest unreasonable delay. Indeed, in the case upon which Johnson relies, *Liberty Nat. Enterprises, L.P. v. Chicago Title Ins. Co.* (2011) 194 Cal.App.4th 839, the delay in bringing the disqualification motion was 25 months from the action's filing. (*Id.* at pp. 843-844.) Second, Gelhaar, counsel for M'Guinness, asserted as early as January 2013 that his client was not waiving any objection to the Law Firm's acting as counsel in the case. It is apparent from the record that M'Guinness and Stuart were denied access to relevant corporate records related to the disqualification motion, including Firm invoices to TLC, until April 25, 2013. Under these circumstances, we conclude appellants did not waive their right to file the disqualification motion.

court's determination based upon undisputed material facts as a question of law (*SpeeDee Oil*, *supra*, 20 Cal.4th at p. 1144), we conclude the court erred in denying the disqualification motion. Further, we conclude that while disqualification is a drastic measure and motions to disqualify are sometimes brought by litigants for improper tactical reasons, disqualification is not "generally disfavored."

In light of our conclusions, we need not decide whether the trial court erred when, with respect to successive representation, it determined that Appellants had failed to establish a substantial relationship between the Law Firm's representation of TLC and its representation of Johnson in this litigation. (*Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 845, fn. 5 [appellate courts will not address issues the resolution of which is unnecessary to disposition of appeal].)

## DISPOSITION

The order denying Appellants' motion to disqualify the law firm of Casas, Riley & Simonian, LLP is reversed. The matter is remanded to the trial court with directions that it vacate its order and enter a new order granting Appellants' motion to disqualify. The temporary stay of all trial proceedings issued on September 30, 2015, in the separate writ proceeding (*M'Guinness et al. v. Superior Court*, H040254) shall remain in effect until this decision is final. Appellants shall recover their statutory costs on appeal.

 

 

_____

Márquez, J.

WE CONCUR:

_____

Bamattre-Manoukian, Acting, P.J.

_____

Grover, J.

27

| | |
|---|---|
| Trial Court: | Santa Clara County Superior Court<br>Superior Court No.: CV239996 |
| Trial Judge: | The Honorable<br>Peter H. Kirwan |
| Attorneys for Plaintiff, Cross-Defendant<br>and Appellant<br>JAMES J. M'GUINNESS: | Ned Morrison Gelhaar<br>Enenstein Ribakoff LaVina & Pham |
| Attorneys for Defendant, Cross-<br>Complainant and Gregory C. Simonian<br>Respondent<br>STEVEN JOHNSON: | Daniel Casas<br>Anthony F. Basile<br>Casas, Riley & Simonian |
| Attorneys for Cross-Complainants, Cross-<br>Defendants and Appellants<br>SCOTT STUART et al.: | Joseph Dozier<br>Dozier & Dozier<br><br>Stephan J. Rafferty<br>Law Office of Stephan J. Rafferty |