Filed 11/29/22 McLawhorn v. Marovic CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| DAMIAN E. McLAWHORN, | |
| Plaintiff and Appellant, | G060721 |
| v. | (Super. Ct. No. 30-2020-01141360) |
| PETAR MAROVIC, as Trustee, etc. et al., | O P I N I O N |
| Defendants and Respondents. | |

Appeal from orders of the Superior Court of Orange County, Nancy E. Zeltzer, Judge. Affirmed. Motion to Dismiss. Denied.

Orlando J. Castaño and Donna Bader for Plaintiff and Appellant.

Fasel Law and Thomas A. Fasel for Defendants and Respondents.

The Continental is a bar owned by plaintiff Damian E. McLawhorn. It operates out of leased space in a building in Fullerton owned by Jose Ybarra (the property). The terms of the original lease and addendum agreements for The Continental, which were assigned to McLawhorn, provided McLawhorn a right of first refusal to purchase the property in the event Ybarra were to sell it.

In 2010, Ybarra signed a promissory note and related documents in consideration for a loan; the note and other documents provided the lender the right of first refusal to lease and/or purchase the property. The promissory note and related documents were later assigned to defendants Petar Marovic and Rosy Marovic, co-trustees of the Marovic Family Trust, dated April 20, 1993.[1]

In 2019, after Ybarra transferred his interest in the property to his wife and further encumbered it with mortgages, the Marovic trustees filed a lawsuit against him for breach of contract and breach of the implied covenant of good faith and fair dealing (the Ybarra action), in which they sought specific performance of their right of first refusal. McLawhorn thereafter initiated the instant action against the Marovic trustees and their son Mario Marovic (collectively, the Marovic parties) and asserted claims for tortious interference with contractual relations and declaratory relief.

The Marovic parties filed a motion under the California anti-SLAPP statute, Code of Civil Procedure section 425.16,[2] in which they argued McLawhorn's entire lawsuit must be stricken because it arose out of the filing of the Ybarra action and was thus protected. The trial court granted the motion only as to the tortious interference with contractual relations claim. McLawhorn appeals from that order as well as the subsequent order awarding the Marovic parties prevailing party attorney fees.

---

[1] We refer to Petar Marovic and Rosy Marovic collectively as the Marovic trustees.

[2] SLAPP is an acronym for "'strategic lawsuit against public participation.'" (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 381, fn. 1 (*Baral*).) All further statutory references are to the Code of Civil Procedure.

We affirm the court's order granting in part the anti-SLAPP motion. McLawhorn's tortious interference with contractual relations claim arose out of protected conduct, namely, the Marovic trustees' filing of the Ybarra action. McLawhorn failed to carry his burden of demonstrating a probability of prevailing on his claim as he failed to produce evidence supporting the first element of his claim—the existence of a valid contract between McLawhorn and a third party at the time of the alleged interference. Because McLawhorn offers no substantive challenge to the attorney fees award, we affirm that order as well.

## FACTS AND PROCEDURAL BACKGROUND

### I.

### THE COMPLAINT

In May 2020, McLawhorn filed a complaint against the Marovic parties asserting claims for tortious interference with contractual relations and declaratory relief. The following is a summary of the allegations of the complaint that are relevant to the issues on appeal.

The Continental, which is owned by McLawhorn, "has conducted business at the [property] by way of lease with Ybarra since on or about November 28, 1999, which has been renewed and extended up and through November 17, 2024." The lease agreement "allow[s] for the lease to be renewed or extended upon landlord Ybarra's discretion and negotiation with McLawhorn, but also provides to McLawhorn a Right of First Refusal to Purchase the [property]. McLawhorn's rights under the lease agreement are superior to any other person or entity." (Some capitalization omitted.)

3

On numerous occasions (at unspecified times), the Marovic parties, through Mario Marovic, have "inquired, requested and offered to buy The Continental from McLawhorn and each time ha[ve] been turned down by McLawhorn."[3]

In November 2010, the Marovic parties "entered into a usury and deceptive promissory note with Ybarra to circumvent and attempt to acquire rights to obtain the [property] and The Continental to the detriment of McLawhorn's rights under the existing lease." The promissory note was eventually paid off in January 2017 and its related deed of trust was conveyed back to Ybarra, extinguishing all rights and obligations between the Marovic parties and Ybarra.

In December 2019, the Marovic trustees filed a lawsuit against Ybarra in which they asserted claims for breach of contract and breach of the implied covenant of good faith and fair dealing and sought specific performance of the Marovic trustees' right of first refusal to lease or purchase the property as set forth in the promissory note and related deed of trust. The Marovic trustees "were aware of McLawhorn's existing rights under the lease for the [property][ and] its relationships with its customers and Ybarra." Through their lawsuit, the Marovic trustees intentionally sought "to interfere, interrupt and tortiously affect the on-going lease agreement and continued operations of the Continental and McLawhorn's rights under the lease agreement to purchase the [property]." Shortly before McLawhorn filed the instant action, Mario Marovic had made an offer to purchase the property as part of an offer to settle the Ybarra action.

---

[3] In the complaint, McLawhorn alleges the Marovic parties own eight or more bars and restaurants in Orange County and "have consistently coveted the Continental to be added to their portfolio."

4

## II.

THE ANTI-SLAPP MOTION, THE OPPOSITION, AND THE PARTIES' SUPPORTING EVIDENCE

The Marovic parties filed an anti-SLAPP motion seeking to strike the complaint on the ground both of McLawhorn's causes of action were based on the protected act of the Marovic trustees filing the Ybarra action.

McLawhorn filed an opposition to the anti-SLAPP motion, arguing: "Put simply, the Anti-SLAPP statute is not triggered by this lawsuit because [McLawhorn]'s claims arise not out of [the Marovic parties]' exercise of their constitutional right to petition, but rather a property dispute, whereby Defendants Petar and Rosy Marovic, through the assistance of their son Mario Marovic who spearheads all transactions, have intentionally attempted to steal and take [McLawhorn]'s known existing rights *by asking for Specific Performance from Juan Ybarra to sell the subject 'Building'* (115 W. Santa Fe, Fullerton, CA) to [the Marovic parties], knowing with full knowledge that [McLawhorn] has a pre-existing and priority right of First Refusal to Purchase and/or Lease the Building. [McLawhorn] is not chilling [the Marovic parties'] ability to seek monetary damages, if any, against Ybarra. [¶] It is with complete audacity that [the Marovic parties] state '[*the Marovic trustees are*] *pursuing litigation against Juan Ybarra,* [*McLawhorn*]*'s landlord, in good faith and without any interference with any alleged contractual rights of* [*McLawhorn*].' [Citation]" (Bold, underscoring, and some capitalization omitted; first italics added.)

The evidence presented by the parties in connection with the anti-SLAPP motion is largely undisputed and, in some instances, varies from the allegations of McLawhorn's complaint. We summarize the relevant evidence as follows.

In February 1999, Ybarra entered into a lease agreement whereby he leased portions of the property (including the location of The Continental) to Sean Francis and Carlo Terranova (the original tenants). The initial lease term was from May 1, 1999 until April 30, 2001. But the lease agreement provided the original tenants two options to

5

extend the lease for an additional six-year period, each on certain terms and conditions. The lease agreement also offered the original tenants a right of first refusal to purchase all or any part of the premises during the term of the lease. In 2005, Ybarra and the original tenants agreed upon an addendum, which provided the tenants an option for a third extended term of five years following the expiration of the second extended term on certain terms and conditions. On an unspecified date thereafter, the original tenants assigned their interest in the lease agreement to McLawhorn.

In November 2010, third party Robert Ranek loaned $439,158.47 to Ybarra. Ybarra executed a promissory note which contained a provision granting Ranek the right of first refusal to lease or purchase the property: "Lender shall have the first right of refusal to purchase the Property, second only to any existing right of refusal at the time of executing this Note. At this time, the only known right of first refusal to purchase the property is that held by Sean Francis and Carlo Terranova [the original tenants] as contained in the lease of the Property dated February 28, 1999 . . . . [Their] right of first refusal shall expire with the termination of the lease." The promissory note provided that Ybarra "shall not extend the term of any existing leases on the Property [Ybarra] is not already obligated to do so by contract" for the duration of the loan. In addition, the note provided that Ranek's right of first refusal to lease the property "shall exist and continue for a term of not less than twelve years from November 13, 2010" and his right of first refusal to purchase the property "shall exist and continue so long as [Ybarra] legally owns the property." Ybarra and Ranek entered into a right of first refusal agreement reiterating such terms and Ybarra's debt to Ranek was secured by a deed of trust that referenced Ranek's right of first refusal.

In February 2011, Ranek assigned the promissory note, the right of first refusal agreement, and the deed of trust to the Marovic trustees.

In November 2014, Ybarra and McLawhorn entered into a letter of intent to enter into an agreement to further extend the lease for an additional 10 years. Ybarra

6

signed the "Letter of Intent to Enter Agreement—The Continental Room," which concluded: "I, Juan Ybarra, on behalf of myself and any and all interested parties with any ownership interest, legal or equitable, in the subject property . . . , and with express authority, hereby provide this Letter of Intent to enter into an agreement extending the lease at the subject property Ten (10) years, should Damian McLawhorn obtain 100% ownership in The Continental Room, a current tenant at the subject property. Mr. McLawhorn will also transfer 25% upon the lease being extended. If Damian McLawhorn sells Continental Ybarra gets first right of refusal."

In January 2017, Ybarra paid off the promissory note and a reconveyance deed was executed back to Ybarra.

In December 2019, the Marovic trustees initiated the Ybarra action by filing a complaint asserting claims for breach of contract and breach of the implied covenant against Ybarra. In their complaint, the Marovic trustees alleged that, notwithstanding their right of first refusal to lease or purchase the property, in January 2017, Ybarra transferred title to the property to Melanie M. Ybarra and also "pledged and or hypothecated the Property by mortgage, to Lantern Financial Corp., and received . . . monies amounting to $675,000.00."

The following year, Ybarra again "pledged and or hypothecated the Property by mortgage, to Lantern Financial Corp., and received monies amounting to $67,000.00" And once again, the year after that, Ybarra "pledged and or hypothecated the Property by mortgage, to Lantern Financial Corp., and received a mortgage amounting to $830,000.00"[4] The complaint stated that "on or about the same day

---

[4] The Marovic trustees alleged such conduct constituted a breach of the parties' right of first refusal agreement because Ybarra had therein agreed not to "'sell, transfer, convey, give assignment, lease, hypothecation or pledge of all or any portion of the Property or Grantor's interest in the Property, except for a conveyance or transfer by inheritance,'" without first offering the property to the Marovic trustees.

7

[Ybarra] received $830,000.00 from Lantern Financial Corp., March 27, 2019, [Ybarra] removed Melanie M. Ybarra from title by way of an Interspousal Transfer Deed."

In the complaint, the Marovic trustees alleged "[Ybarra] has failed to give prior written notice to [the Marovic trustees], as required by the Agreement, prior to transferring, conveying, pledging or hypothecating the Property, so that [the Marovic trustees] may have an opportunity to exercise [their] right of first refusal."

### III.
### THE TRIAL COURT GRANTS THE ANTI-SLAPP MOTION IN PART AND AWARDS THE MAROVIC PARTIES PREVAILING PARTY ATTORNEY FEES AND COSTS

Following the hearing on the anti-SLAPP motion, the trial court granted the motion in part and denied it in part. The court granted the anti-SLAPP motion as to the tortious interference with contractual relations claim. The court found this claim arose out of protected conduct—the filing of the Ybarra action. The court further found McLawhorn had failed to show a probability of prevailing on the merits of that claim because he failed to present admissible evidence relevant to the first element of a claim for tortious interference with contractual relations—that he had a valid contract with Ybarra. The trial court denied the anti-SLAPP motion as to the declaratory relief claim.

The trial court later granted the Marovic parties' motion for prevailing party attorney fees and awarded them $5,625 in fees and $304.18 in costs. McLawhorn appealed from the court's orders.

### MOTION TO DISMISS

The Marovic parties have filed a motion to dismiss this appeal as untimely. Section 425.16, subdivision (i) provides that "[a]n order granting or denying a special motion to strike shall be appealable under Section 904.1." (See § 904.1, subd. (a)(13).)

8

Rule 8.104(a) of the California Rules of Court[5] sets forth the deadlines to file a notice of appeal as follows: "Unless a statute or rules 8.108, 8.702, or 8.712 provides otherwise, a notice of appeal must be filed on or before the earliest of: [¶] (1) [¶] (A) 60 days after the superior court clerk serves on the party filing the notice of appeal a document entitled 'Notice of Entry' of judgment or a filed-endorsed copy of the judgment, showing the date either was served; [¶] (B) 60 days after the party filing the notice of appeal serves or is served by a party with a document entitled 'Notice of Entry' of judgment or a filed-endorsed copy of the judgment, accompanied by proof of service; or [¶] (C) 180 days after entry of judgment."[6]

In other words, to start the 60-day clock to file a notice of appeal under rule 8.104(a)(1)(A) or (B), the court clerk or a party must serve a document entitled notice of entry of judgment or a filed-endorsed copy of the appealable judgment or order itself. Here, neither the court clerk nor any party served a document entitled notice of entry of judgment or a filed-endorsed copy of the court's minute order; the Marovic parties do not contend otherwise. As a result, the 60-day time period was never triggered and McLawhorn, therefore, had 180 days within which to appeal from the April 8, 2021 order. McLawhorn filed his notice of appeal on September 24, 2021, which was the 169th day following the court's ruling and thus safely within the 180-day period under rule 8.104(a)(1)(C).

In their motion to dismiss and at oral argument, the Marovic parties argue the 60-day clock started to run on the time to appeal under rule 8.104(a)(1)(A) when the court clerk served on McLawhorn a copy of the trial court's minute order granting in part the anti-SLAPP motion. The California Supreme Court in *Alan v. American Honda Motor Co., Inc.* (2007) 40 Cal.4th 894, 902 (*Alan*), however, held that the court clerk's

[5] All further references to court rules are to the California Rules of Court.

[6] Subdivision (e) of rule 8.104 provides that the term "'judgment'" in subdivision (a) "includes an appealable order if the appeal is from an appealable order."

9

service on the appellant of a dated minute order did not itself qualify as a "'file-stamped copy'" of the minute order under former rule 8.104. In concluding the trial court erred by dismissing the appellant's appeal as untimely, the Supreme Court explained: "While [the clerk's mailing] did contain a copy of the appealable minute order, that order is not file stamped. The typed or printed notation that appears at the bottom of that order— 'MINUTES ENTERED 01/02/03 COUNTY CLERK'—is not a file stamp. [Citation.] Accordingly, the clerk's mailing did not satisfy rule 8.104(a)(1), and [appellant]'s notice of appeal was timely filed . . . ." (*Alan, supra*, at p. 902; see *M'Guinness v. Johnson* (2015) 243 Cal.App.4th 602, 612 [a single self-sufficient document must satisfy all of rule 8.104(a)(1)'s conditions to trigger shorter 60-day period for filing a notice of appeal].)[7]

The governing version of rule 8.104(a)(1) requires that, absent service of a notice of entry of judgment, the court clerk or party must serve a filed-endorsed copy of the appealable judgment or order to trigger the 60-day deadline to file a notice of appeal. Our record does not show that a filed-endorsed copy of the court's minute order (or file-stamped copy under the former version of the rule) was served on McLawhorn. We therefore conclude McLawhorn's notice of appeal was timely filed, deny the Marovic

---

[7] The Supreme Court in *Alan, supra*, 40 Cal.4th at pages 902-903 required strict compliance with rule 8.104(a)(1): "An additional principle of construction applies when courts are called upon to resolve ambiguities in rules that limit the right to appeal, such as rule 8.104(a)(1). In such cases we follow the well-established policy already mentioned, namely, that of 'according [the] right [to appeal] in doubtful cases "when such can be accomplished without doing violence to applicable rules."' [Citation.] This principle has led courts interpreting rule 8.104(a)(1) and its predecessors to hold that documents mailed by the clerk do not trigger the 60-day period for filing a notice of appeal unless the documents strictly comply with the rule. 'Because the time limits for filing a notice of appeal are jurisdictional, we must apply [former] rule 2(a)(1) . . . strictly and literally according to its terms; the rules "must stand by themselves without embroidery."' [Citations.] Thus, courts have consistently held that the required 'document entitled "Notice of Entry"' (rule 8.104(a)(1)) must bear precisely that title, and that the 'file-stamped copy of the judgment' (*ibid.*) must truly be file stamped. [Citations.]"

parties' motion to dismiss the appeal, and next address the merits of the parties' respective arguments challenging the trial court's ruling on the anti-SLAPP motion.

DISCUSSION

I.

SECTION 425.16 AND THE GOVERNING STANDARD OF REVIEW

"A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1).) "The anti-SLAPP statute does not insulate defendants from *any* liability for claims arising from the protected rights of petition or speech. It only provides a procedure for weeding out, at an early stage, meritless claims arising from protected activity." (*Baral, supra*, 1 Cal.5th at p. 384.)

"Litigation of an anti-SLAPP motion involves a two-step process. First, 'the moving defendant bears the burden of establishing that the challenged allegations or claims "aris[e] from" protected activity in which the defendant has engaged.' [Citation.] Second, for each claim that does arise from protected activity, the plaintiff must show the claim has 'at least "minimal merit."' [Citation.] If the plaintiff cannot make this showing, the court will strike the claim." (*Bonni v. St. Joseph Health System* (2021) 11 Cal.5th 995, 1009 (*Bonni*).) "We have described this second step as a 'summary-judgment-like procedure.' [Citation.] The court does not weigh evidence or resolve conflicting factual claims. Its inquiry is limited to whether the plaintiff has stated a legally sufficient claim and made a prima facie factual showing sufficient to sustain a favorable judgment. It accepts the plaintiff's evidence as true, and evaluates the defendant's showing only to determine if it defeats the plaintiff's claim as a matter of

11

law.  [Citation.]  '[C]laims with the requisite minimal merit may proceed.'  [Citation.]" (*Baral, supra*, 1 Cal.5th at pp. 384-385, fn. omitted.)

In *Baral, supra*, 1 Cal.5th at page 393, the California Supreme Court held the Legislature's choice of the term "'motion to strike'" reflected the understanding that "an anti-SLAPP motion, like a conventional motion to strike, may be used to attack parts of a count as pleaded.  [Citations.]"  If the targeted claim amounts to a cause of action "in the sense that it is alleged to justify a remedy[,]" it is subject to an anti-SLAPP motion. (*Id.* at p. 395.)  "Assertions that are 'merely incidental' or 'collateral' are not subject to section 425.16.  [Citations.]  Allegations of protected activity that merely provide context, without supporting a claim for recovery, cannot be stricken under the anti-SLAPP statute."  (*Id.* at p. 394.)

"We review an order granting or denying an anti-SLAPP motion under the de novo standard and, in so doing, conduct the same two-step process to determine whether as a matter of law the defendant met its burden of showing the challenged claim arose out of protected activity and, if so, whether the plaintiff met its burden of showing probability of success."  (*Newport Harbor Offices & Marina, LLC v. Morris Cerullo World Evangelism* (2018) 23 Cal.App.5th 28, 42 (*Newport Harbor*).)

## II.

### THE TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS CLAIM AROSE OUT OF PROTECTED ACTIVITY

In the opening brief, McLawhorn does not question that the Marovic trustees' act of filing the Ybarra action is protected activity under the anti-SLAPP statute. It is well established "anti-SLAPP protection for petitioning activities applies not only to the filing of lawsuits, but extends to conduct that relates to such litigation, including statements made in connection with or in preparation of litigation.  [Citation.]  Indeed, courts have adopted 'a fairly expansive view of what constitutes litigation-related activities within the scope of section 425.16.'"  (*Alfaro v. Waterhouse Management Corp.*

12

(2022) 82 Cal.App.5th 26, 33, citing *Bonni, supra*, 11 Cal.5th at p. 1024 ["claims that arise out of the filing of a suit arise from protected activity for purposes of the anti-SLAPP statute"].)

Instead, McLawhorn argues in his opening brief that his tortious interference with contractual relations claim does not arise from the filing of the Ybarra action: "At first blush, one might assume McLawhorn's complaint arises from the Marovics' exercise of protected activity because it was filed *after* the Ybarra complaint and is specifically listed as one of four categories in section 425.16(e). McLawhorn's complaint identifies the Ybarra lawsuit in his Preliminary Allegations as an intentional and tortious interference with his property rights, and in particular, his right to purchase the property pursuant to a superior contractual right of first refusal with Ybarra. [Citation.] [¶] However, the inclusion of these allegations does not mean that McLawhorn's claims were *triggered* by protected activity." McLawhorn repeatedly points out that the Ybarra action is not referenced in the tortious interference with contractual relations section of the complaint.

McLawhorn's argument suggests a misunderstanding of the governing legal standards. "A defendant satisfies the first step of the analysis by demonstrating that the 'conduct by which plaintiff claims to have been injured falls within one of the four categories described in subdivision (e) [of section 425.16]' [citation], and that the plaintiff's claims in fact *arise* from that conduct [citation]." (*Rand Resources, LLC v. City of Carson* (2019) 6 Cal.5th 610, 620; see § 425.16, subd. (e)(1) [anti-SLAPP statute protects "any written or oral statement or writing made before a . . . judicial proceeding"].) It does not matter *how* the complaint pleads that conduct. It therefore does not matter that McLawhorn's allegations the Marovic trustees interfered with his rights under the lease agreement by filing the Ybarra action were placed in the portion of his complaint entitled "Preliminary Allegations," instead of directly under the heading "First Cause of Action (Tortious Interference with Contractual Relations)." (Bold and

13

underscoring omitted.) The complaint expressly incorporates and realleges all of the allegations under the preliminary allegations heading into the first cause of action. (See *Bonni, supra*, 11 Cal.5th at p. 1011 ["Plaintiffs do, of course, have considerable discretion in how to shape their pleadings" and "we do not believe the Legislature in enacting the anti-SLAPP statute intended to make the protections of the anti-SLAPP law turn on a plaintiff's pleading choices"].)

Here, the complaint directly states the tortious interference with contractual relations claim is based on the Marovic trustees' act of filing the Ybarra action which, the complaint alleges, they filed "*to interfere*, interrupt and tortiously affect the on-going lease agreement and continued operations of the Continental and McLawhorn's rights under the lease agreement to purchase the [property]." (Italics added.)[8] The trial court therefore correctly determined the express language of the complaint established the tortious interference with contractual relations claim arises from protected activity—the filing of the Ybarra action.[9]

---

[8] McLawhorn's opening brief echoes the complaint's allegations that the tortious interference claim depends on the filing of the Ybarra action. At page 19 of the opening brief, McLawhorn states: "[T]he Marovics' *attempts to secure specific performance* as to The Continental, which is currently operated by McLawhorn, certainly *interferes with his contractual rights*." (Italics added.) At page 20 of the opening brief, he states: "Essentially, McLawhorn is claiming the Marovics attempted to force a sale of the property to them *by asserting a claim for specific performance from Ybarra*, despite their knowledge of McLawhorn's earlier and superior right of first refusal to do the same thing, i.e., purchase the building." (Italics added.)

[9] In the complaint, McLawhorn alleges that, shortly before he filed the instant action, Mario Marovic had made an offer (presumably to Ybarra) to purchase the property as part of an offer to settle the Ybarra action. To the extent McLawhorn argues that allegation shows unprotected conduct also supports his tortious interference with contractual relations claim, his argument is without merit. "'[S]ettlement negotiations are regarded as an exercise of the right to petition [and thus] communications during such negotiations are regarded as having been made in connection with the underlying lawsuit for purposes of section 425.16, subdivision (e)(2).' [Citation.]" (*Trilogy Plumbing, Inc. v. Navigators Specialty Ins. Co.* (2020) 50 Cal.App.5th 920, 931.)

14

In his opening brief, McLawhorn further argues "[a] review of McLawhorn's complaint demonstrates he has alleged wrongful activities that occurred *before* the filing of the underlying complaint, such as the Marovics['] attempts to interfere with McLawhorn's lease, preparing a usurious and deceptive note, and the Marovics' attempts to purchase the building when they knew McLawhorn already possessed an earlier and superior right of first refusal to purchase the building." McLawhorn argues, "In examining the allegations set forth in McLawhorn's complaint, this Court will see that the gravamen or thrust of his claims arise from a property dispute, not the filing of the underlying action."

The Supreme Court in *Baral, supra*, 1 Cal.5th at page 382 addressed how courts should apply the anti-SLAPP statute to a "'mixed cause of action,'" a term defined by the court in *Bonni, supra*, 11 Cal.5th at page 1010 as "a cause of action that rests on allegations of multiple acts, some of which constitute protected activity and some of which do not." Following *Baral*, "[a]nalysis of an anti-SLAPP motion is not confined to evaluating whether an entire cause of action, as pleaded by the plaintiff, arises from protected activity or has merit. Instead, courts should analyze each claim for relief—each act or set of acts supplying a basis for relief, of which there may be several in a single pleaded cause of action—to determine whether the acts are protected and, if so, whether the claim they give rise to has the requisite degree of merit to survive the motion. [Citation.]" (*Bonni, supra*, 11 Cal.5th at p. 1010.)

Although McLawhorn does not cite *Baral* or *Bonni* in his appellate briefs, his argument is essentially that his tortious inference with contractual relations claim is a mixed cause of action as it is not only based on the Marovic trustees' act of filing of the Ybarra action and litigation activities, but on additional prior acts that do not constitute protected activity. McLawhorn's argument is without merit.

"Tortious interference with contractual relations requires '(1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge

15

of that contract; (3) the defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage.' [Citations.]" (*Ixchel Pharma, LLC v. Biogen, Inc.* (2020) 9 Cal.5th 1130, 1141.)

Our examination of the complaint shows the tortious interference with contractual relations claim is not based on conduct other than the filing of the Ybarra action and related litigation activities. The complaint alleges the Marovic parties made inquiries, requests, and offers *to McLawhorn* regarding their purchase of The Continental from him; the complaint alleges all such requests were turned down by McLawhorn. But such conduct cannot support a claim for tortious interference with contractual relations because it does not involve a third party.

McLawhorn's complaint also alleges as a basis for his tortious interference claim that Ybarra and the Marovic trustees entered into an "usur[ious] and deceptive" promissory note in 2010. The evidence produced by the Marovic parties in support of the anti-SLAPP motion (cited by McLawhorn in his appellate briefs) showed it was third party Ranek, and not the Marovic trustees, who entered into the subject promissory note and related agreements with Ybarra and took a deed of trust on the property as security. Ranek later assigned the promissory note to the Marovic trustees. McLawhorn has not alleged, and does not argue on appeal, that Ranek's act of assigning the promissory note to the Marovic trustees, or the Marovic trustees' receipt of such an assignment, is or could be a basis for his tortious interference with contractual relations claim.

Furthermore, McLawhorn's argument the trial court erred by failing to broadly conclude the gravamen of his tortious interference with contractual relations claim constitutes a mere "property dispute" devoid of protected conduct is without merit. The Supreme Court rejected such an approach in *Bonni, supra*, 11 Cal.5th at page 1011: "Bonni contends that because the motion aimed at the entire cause of action, we should consider whether the gravamen of the entire cause of action was based on protected or

16

unprotected activity. [¶] We reject the contention: Our holding in *Baral* applies even though the Hospitals sought to strike the entire cause of action, rather than merely parts of it. If we were instead to adopt Bonni's proposed gravamen approach, we would again risk saddling courts with an obligation to settle intractable, almost metaphysical problems about the 'essence' of a cause of action that encompasses multiple claims. [Citation.]"[10]

In any event, McLawhorn has not explained how the simple fact that the parties were engaged in a property dispute would support a claim for tortious *interference* with contractual relations which requires as an element a showing of intentional acts designed to induce a breach or disruption of a contractual relationship with a third party.

McLawhorn's reliance on *Episcopal Church Cases* (2009) 45 Cal.4th 467, is inapt. That case is factually and legally distinguishable from the instant case because there, "the actual dispute concern[ed] property ownership rather than any . . . protected activity." (*Id.* at p. 473.) That case did not address the application of the anti-SLAPP law to a claim for tortious interference with contractual relations based on the filing of a lawsuit.

The trial court therefore did not err by concluding the tortious inference with contractual relations claim arose out of protected activity.

---

[10] The *Bonni* court added: "To be clear, we do not suggest that every court that has continued to label its approach a gravamen test even after *Baral* has erred. Some courts have invoked the term not in the way Bonni suggests—to determine the essence or gist of a so-called mixed cause of action—but instead to determine whether particular acts alleged within the cause of action supply the elements of a claim [citation] or instead are incidental background [citations]. This approach is consistent with *Baral*, which reaffirmed that '[a]ssertions that are "merely incidental" or "collateral" are not subject to section 425.16. [Citations.] Allegations of protected activity that merely provide context, without supporting a claim for recovery, cannot be stricken under the anti-SLAPP statute.' [Citation.]" (*Bonni, supra*, 11 Cal.5th at p. 1012.)

# III.

## MCLAWHORN DID NOT SHOW A PROBABILITY OF PREVAILING ON THE MERITS

As discussed *ante*, once the Marovic parties met their burden of demonstrating the tortious interference with contractual relations claim arose from protected conduct, the burden shifted to McLawhorn to demonstrate that claim "is legally sufficient and factually substantiated." (*Baral, supra*, 1 Cal.5th at p. 396.) A plaintiff cannot meet this burden by relying on its own pleading but must present admissible evidence. (*Newport Harbor, supra*, 23 Cal.App.5th at p. 49.)

In its minute order, the trial court acknowledged the evidence that showed the original tenants had assigned the lease agreement and the three addendum agreements to McLawhorn, and that the original lease agreement provided the original tenants the right of first refusal to purchase the property should Ybarra sell it. The court addressed McLawhorn's assertion that, prior to the termination of the existing lease agreement (as extended through the three addendum agreements to last through April 30, 2018), in 2014, McLawhorn and Ybarra *actually* agreed to a further extension of the lease for another 10 years. In its minute order, the court stated: "Although [McLawhorn] states that he entered into an extension agreement, he has not submitted any evidence which shows that [McLawhorn] and Ybarra entered into a lease extension. On April 1, 2021, following oral argument, the court continued the hearing on the Motion to allow [McLawhorn] to submit the purported 'Lease Extension agreement' which [McLawhorn] argues shows that [McLawhorn] and Ybarra entered into a lease extension. [Citation.] Thereafter, [McLawhorn] submitted a 'Letter of Intent to Enter Agreement—The Continental Room.' The Letter of Intent dated November 12, 2014 was sent by [McLawhorn]'s counsel to Ybarra and states that [McLawhorn] intends to enter into an extension of [McLawhorn's] Lease."

The court observed: "Although the Letter of Intent shows that the parties intended to enter into a 10-year lease extension if [McLawhorn] was successful in

obtaining 100% ownership of The Continental Room, the Letter of Intent does not show that [McLawhorn] and Ybarra actually entered into a lease extension." The trial court concluded "[McLawhorn] has failed to present admissible evidence to show that he had a valid contract with Ybarra through 2024. [McLawhorn]'s lease was set to expire on February 27, 2017.[11] [Citation.] Therefore, [McLawhorn] has failed to satisfy the first element of the existence of a valid contract with a third party."

We agree with the trial court's assessment. The record is devoid of evidence of the existence of a valid contract at the time the Marovic trustees filed the Ybarra action to allegedly interfere with said contract. The evidence before the court showed the lease term had been most recently extended to end April 30, 2018—over 18 months before the Marovic trustees filed the Ybarra complaint.

We reject McLawhorn's argument in the opening brief that the Letter of Intent to Extend Lease "is enforceable as a valid extension of the 1999 lease" to 2024. The Letter of Intent did not itself constitute an agreement to extend the lease, but an agreement of intent to extend the lease if certain conditions were met. Contrary to McLawhorn's assertions in his opening brief that he met the conditions for the 10-year extension (e.g., that he obtain 100% ownership of The Continental and its liquor license), he offered no *evidence* those conditions had been met. McLawhorn has not alleged or argued the Marovic parties interfered with the terms of the Letter of Intent (as opposed to the lease agreement itself) by, for example, interfering with McLawhorn's efforts to satisfy the requisite conditions for entering into the 10-year extension of the lease term.

---

[11] The trial court cited the anti-SLAPP motion itself to support its statement the lease agreement terminated by February 27, 2017. In the respondent's brief, the Marovic parties have corrected that termination date to April 30, 2018. The record supports the latter date (e.g., two six-year-term extensions plus one five-year-term extension to the original lease term ending April 2001 would result in an April 2018 lease termination date unless further extended).

In the opening brief, McLawhorn tacitly acknowledges that absence of evidence showing the existence of a valid contract extending the lease beyond 2018. McLawhorn argues: "[T]he facts showed Ybarra and McLawhorn have been operating under the terms of the Letter of Intent to Enter Lease for over seven years and neither party has disputed the existence or validity of the lease extension. Since Ybarra has never disputed the lease extension and fully performed according to its terms, there is no reason why a second contract, i.e., a lease extension, was required to validate the lease." McLawhorn misses the point. In order to sue a party for tortious interference with contractual relations, the existence of a valid contract between the plaintiff and a third party must be shown.

In the opening brief, McLawhorn cites a declaration by Ybarra that was filed in opposition to the Marovic parties' motion for prevailing party attorney fees. In that declaration, Ybarra stated he intended the Letter of Intent to be "an extension and that all times to have extended the existing Continental Room lease and both parties have continued to operate under the understanding the lease has been continued by virtue of the specific performance of continuously collecting rent for the past 7 years." McLawhorn acknowledges this declaration was not offered in connection with the anti-SLAPP motion itself and thus was not considered by the trial court in ruling on the anti-SLAPP motion. We therefore do not consider it here. But even if we were to consider it, Ybarra's subjective intent is irrelevant to interpretation of the agreement. (See *Founding Members of the Newport Beach County Club v. Newport Beach Country Club, Inc.* (2003) 109 Cal.App.4th 944, 956 ["California recognizes the objective theory of contracts" by which "'[i]t is the objective intent, as evidenced by the words of the contract, rather than the subjective intent of one of the parties, that controls interpretation'"].)

Finally, in the opening brief, McLawhorn argues "[t]he Marovics' attempts to portray what Ybarra said to Ranek or them is inadmissible or objectionable hearsay."

20

While it is unclear what statements McLawhorn is referring to, any statements made by Ybarra to Ranek are irrelevant to the resolution of the issues presented in this appeal. Even if they were relevant, McLawhorn has forfeited any argument regarding their admissibility as evidence for having failed to raise it in the trial court.

IV.

ATTORNEY FEES AWARD

In his opening brief, McLawhorn states: "In the event this Court concludes the trial court erred in granting the anti-SLAPP motion as to McLawhorn's First Cause of Action, then the trial court's award of attorney's fees should also be reversed." For the reasons discussed *ante*, we conclude the trial court did not err in granting the anti-SLAPP motion as to the tortious interference with contractual relations claim. As McLawhorn has not otherwise challenged the order awarding attorney fees and costs, we do not address it further.

DISPOSITION

The orders are affirmed. Respondents shall recover costs on appeal.

MOTOIKE, J.

WE CONCUR:

O'LEARY, P. J.

MARKS, J.*

*Judge of the Orange County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

21